# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3695

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Billy Jo Lara, also known as | * | |
| Billy Joe Lara, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 11, 2002

Filed: March 24, 2003

_____

Before HANSEN, Chief Judge, McMILLIAN, BOWMAN, WOLLMAN, LOKEN,
MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY,
and SMITH, Circuit Judges, En Banc.

_____

WOLLMAN, Circuit Judge.

After a Spirit Lake Nation Reservation tribal court convicted him of assaulting
a police officer, Billy Jo Lara was indicted by the federal government for assault on
a federal officer in violation of 18 U.S.C. § 111(a)(1). Lara moved to dismiss the
indictment on double jeopardy and selective prosecution grounds. Following the
district court's denial of the motion, Lara entered a conditional plea of guilty to the
indictment, reserving his right to appeal the denial of his motion to dismiss. A panel

of this court affirmed, holding that because the power of the Spirit Lake Nation derives from its retained sovereignty and not from Congressionally delegated authority, Lara's conviction on the federal charge did not run afoul of the Double Jeopardy Clause. We granted Lara's petition for rehearing en banc, vacating the panel's opinion and judgment. We now reverse.

## I.

While on the Spirit Lake Nation Reservation on June 13, 2001, Lara was arrested for public intoxication by Bureau of Indian Affairs police officers. The officers informed Lara, who is not a member of the Spirit Lake Nation, of an exclusion order prohibiting him from entering the reservation. Upon hearing of the exclusion order, Lara struck one of the officers with his fist. Lara was charged with five violations of Spirit Lake Tribal Code: violence to a policeman, resisting lawful arrest, public intoxication, disobedience to a lawful order of the tribal court, and trespassing. On June 15, Lara pled guilty to the first three charged offenses and was sentenced to a jail term of 155 days. On August 29, a federal grand jury returned an indictment charging Lara with assault on a federal officer in violation of 18 U.S.C. § 111(a)(1). After consenting to proceed before a United States Magistrate Judge, Lara moved to dismiss the indictment on double jeopardy and selective prosecution grounds or, in the alternative, that discovery be allowed on the claim of selective prosecution. As recounted above, the magistrate judge denied the motions, and Lara entered a plea of guilty conditioned on his right to seek appellate review of his motion to dismiss the indictment.

## II.

We review <u>de novo</u> the denial of a motion to dismiss on double jeopardy grounds. <u>United States v. Alverez</u>, 235 F.3d 1086, 1089-90 (8th Cir. 2000). The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be

subject for the same offence to be twice put in jeopardy of life or limb." The right to be free from multiple prosecutions is limited by the dual sovereignty doctrine, which permits an independent sovereign to prosecute an individual who has been prosecuted by another sovereign for the same act. One who violates the laws of two independent sovereigns commits an offense against each, and thus a second prosecution is not for "the same offence." Heath v. Alabama, 474 U.S. 82, 88 (1985).

The application of the dual sovereignty doctrine "turns on whether the two entities draw their authority to punish the offender from distinct sources of power." Id. The Double Jeopardy Clause does not permit successive prosecutions under the dual sovereignty doctrine where the authority for the prosecution derives from the same sovereign source. See, e.g., Waller v. Florida, 397 U.S. 387, 393-95 (1970) (a city and its parent state); Puerto Rico v. Shell Co., 302 U.S. 253, 264-66 (1937) (the federal government and a territorial government); Unites States v. Mills, 964 F.2d 1186, 1193 (D.C. Cir. 1992) (en banc) (the federal government and the District of Columbia). Conversely, the dual sovereignty doctrine permits a state to prosecute a defendant who has previously been prosecuted for the same act by another state or the federal government. Heath, 474 U.S. at 93 (two states); Bartkus v. Illinois, 359 U.S. 121, 139 (1959) (upholding state prosecution following federal prosecution); United States v. Williams, 104 F.3d 213, 216 (8th Cir. 1997) (upholding federal prosecution following state prosecution). Consequently, whether the dual sovereignty doctrine applies to Lara's double jeopardy challenge turns on whether the Spirit Lake Nation exercised sovereign authority emanating from a sovereign source distinct from that of the overriding federal sovereign.

In Oliphant v. Suquamish Indian Tribe, 435 U.S. 191 (1978), the Supreme Court held that a tribe had no inherent power to prosecute non-Indian residents of its reservation. "By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress." Id. at 210. In United

States v. Wheeler, the defendant raised a double jeopardy challenge to a federal prosecution commenced after Wheeler, an enrolled member of the tribe, had been convicted in tribal court on a lesser included offense. 435 U.S. 313, 315-16 (1978). Wheeler argued that because Congress has plenary authority to abrogate tribal sovereignty, the tribe was in effect an arm of the federal government. Id. at 319. The Court explained that its dual sovereignty precedents did not turn on the extent of control one sovereign had over another, but whether the two prosecutions exercised authority derived from the same ultimate source of power. Id. at 319-20. The Court held that among the "unique and limited" sovereign powers retained by the tribe was the power to punish "members of the Tribe for violations of tribal law." Id. at 323-24. The distinction expressly and repeatedly drawn by the Court was not premised on the racial status of the defendant but on his membership status. Although tribes retained authority over their internal affairs, they had been implicitly or explicitly divested of authority over nonmembers. Id. at 324-25. "The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe." Id. at 326. Because Wheeler was an enrolled member of the tribe, he was prosecuted pursuant to an inherent sovereign power that had never been divested from the tribe, and thus subsequent federal prosecution for the same act was not barred. Id. at 332.

In Montana v. United States, 450 U.S. 544 (1981), the Court again emphasized the distinction between the retained or inherent sovereignty over internal relations between members of the tribe and the sovereignty over external relations that necessarily had been divested from the tribes. "[T]he dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently *to determine their external relations*." Id. at 564 (quoting Wheeler, 435 U.S. at 326, emphasis added by Montana Court). The Court held that the tribe's retained inherent sovereignty did not authorize it to regulate hunting and fishing by nonmembers on reservation land owned in fee by nonmembers. Id. at 564-65.

The question of what power a tribe has over nonmember Indians was addressed in Duro v. Reina, 495 U.S. 676 (1990). Duro, an enrolled member of a different tribe, was charged in Pima-Maricopa Indian Community Court with unlawful firing of a weapon, a misdemeanor, in connection with the death of an Indian boy. Id. at 679-81. His motion to dismiss for lack of jurisdiction was denied. Id. at 681-82. Because the Salt River Pima-Maricopa Indian Community did not claim that its jurisdiction over Dura stemmed from Congressionally delegated authority, the Court was faced with the question whether the tribe's retained or inherent sovereignty provided it with jurisdiction over a nonmember Indian. The Court held that it did not. Id. at 688 ("In the area of criminal enforcement, however, tribal power does not extend beyond internal relations among members.").

In response to the decision in Duro, Congress amended the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1301, by revising the definition of "powers of self-government" to include "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1301(2). The amendment also defined "Indian" to include all Indians subject to federal jurisdiction under the Indian Major Crimes Act, 18 U.S.C. § 1153. 25 U.S.C. § 1301(4). Thus, under the ICRA amendments, Indians who are enrolled members of a federally recognized tribe are subject to the jurisdiction of all tribes.

Although the Supreme Court has not yet construed the post-Duro ICRA amendments, it has repeatedly reaffirmed its holdings limiting tribal sovereign authority to tribe members. Atkinson Trading Co. v. Shirley, 532 U.S. 645 (2001) (rejecting under the Montana test the imposition of a hotel occupancy tax on nonmember-owned reservation hotel on non-Indian fee land); Nevada v. Hicks, 533 U.S. 353, 358-59 (2001) (citing Oliphant for the general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe").

-5-

Although Indian tribes retain inherent authority to punish members who violate tribal law, to regulate tribal membership, and to conduct internal tribal relations, United States v. Wheeler, 435 U.S. 313, 326 (1978), the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." Montana, 450 U.S. at 564.

South Dakota v. Bourland, 508 U.S. 679, 694-95 (1993).

In United States v. Weaselhead, 156 F.3d 818 (8th Cir. 1998), we construed the ICRA amendments in a double jeopardy case factually similar to the present case. The district court had held that Duro and Oliphant were federal common law decisions within the ultimate authority of Congress to overrule. 36 F. Supp. 2d 908, 914-15 (D. Neb. 1997). A divided panel of this court reversed, concluding that "ascertainment of first principles regarding the position of Indian tribes within our constitutional structure of government is a matter ultimately entrusted to the Court and thus beyond the scope of Congress's authority to alter retroactively by legislative fiat." 156 F.3d at 824. On rehearing en banc, the panel opinion was vacated and the district court affirmed by an evenly divided court. 165 F.3d 1209 (8th Cir. 1999).

The Ninth Circuit has held Duro to be a common law decision that Congress had the power to override via the ICRA amendments. United States v. Enas, 255 F.3d 662 (9th Cir. 2001) (en banc), cert. denied 534 U.S. 1115 (2002). Although the Enas court conceded that sovereignty has "constitutional implications," id. at 673, it concluded that the lack of an express citation to a constitutional provision indicated that Duro was a common law decision, an area in which Congress is supreme. Id. at 674-75.

With all due respect to the holding in Enas, we conclude that the distinction between a tribe's inherent and delegated powers is of constitutional magnitude and

therefore is a matter ultimately entrusted to the Supreme Court. Absent a delegation from Congress, a tribe's powers are those "inherent powers of a limited sovereignty which has never been extinguished." Wheeler, 435 U.S. at 322 (quoting F. Cohen, Handbook of Federal Indian Law 122 (1945)) (emphasis omitted). Once the federal sovereign divests a tribe of a particular power, it is no longer an inherent power and it may only be restored by delegation of Congress's power.

Congress's broad authority over Indian affairs derives from and is limited by the Constitution. Some decisions root this power in the Indian Commerce Clause. Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 531 n.6 (1998); McClanahan v. Arizona, 411 U.S. 164, 172 n.7 (1973). Prior to 1903, the federal government negotiated agreements with Indian tribes pursuant to its treaty power, U.S. Const. art. II, § 2, cl. 2, but the combination of an 1871 statute and the development of the plenary power doctrine ended this process. Antoine v. Washington, 420 U.S. 194, 201-04 (1975). The Supreme Court has suggested that we must be guided in part by structural principles that are both implicit and explicit in the Constitution. See Seminole Tribe v. Florida, 517 U.S. 44 (1996); see also Duro, 495 U.S. at 684 ("The question we must answer is whether the sovereignty retained by the tribes in their dependent status within our scheme of government includes the power of criminal jurisdiction over nonmembers."). Some decisions have found plenary authority in the government's trust responsibility, Stephens v. Cherokee Nation, 174 U.S. 445, 478 (1899), or in the guardian-ward relationship between the federal government and the tribes, Morton v. Mancari, 417 U.S. 535, 551 (1974), but references to these non-constitutional sources of power have largely been supplanted by a reliance on the commerce power. See, e.g., Alaska v. Native Village, 522 U.S. at 531 n.6.

The ICRA amendments are "a legislative enactment purporting to recast history in a manner that alters the Supreme Court's stated understanding of the organizing principles by which the Indian tribes were incorporated into our constitutional system

of government." <u>Weaselhead</u>, 156 F.3d at 823. In exercising its commerce power, Congress may not "override a constitutional decision by simply rewriting the history upon which it is based." <u>Enas</u>, 255 F.3d at 675. <u>Duro</u>'s determination of first principles regarding Indian sovereignty within the federal system of government is ultimately one for the Court. The Court reaffirmed this principle subsequent to the ICRA amendments:

> The dissent's complaint that we give "barely a nod" to the Tribe's inherent sovereignty argument is simply another manifestation of its disagreement with <u>Montana</u>, which announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe[.]" 450 U.S. at 565. While the dissent refers to our "myopic focus" on the Tribe's prior treaty right to "absolute and undisturbed use and occupation" of the taken area, it shuts both eyes to the reality that after <u>Montana</u>, tribal sovereignty over nonmembers "cannot survive without express congressional delegation," 450 U.S. at 564, and is therefore *not* inherent.

<u>Bourland</u>, 508 U.S. at 695 n.15 (internal citations omitted). Thus the ICRA amendments cannot have the effect that they plainly sought to achieve: a retroactive legislative reversal of <u>Duro</u>. We need not construe the ICRA amendments as a legal nullity, however. It is apparent that Congress wished to allow tribes to exercise criminal misdemeanor jurisdiction over nonmember Indians. <u>See</u> <u>Hicks</u>, 533 U.S. at 377 n.2 ("In response to our decision in <u>Duro</u>, . . . Congress passed a statute expressly granting tribal courts [jurisdiction over nonmember Indians].") (Souter, J., concurring). Nothing in our decision today in any way circumscribes the jurisdiction so conferred.

The Spirit Lake Nation exercises authority over external relations only to the extent that such a power has been delegated to it by Congress. As a nonmember, Lara was necessarily prosecuted pursuant to that delegated power. Because the dual sovereignty doctrine does not apply where the ultimate source of power is the same,

the Double Jeopardy Clause bars the government from maintaining a second prosecution for the same act. Accordingly, the motion to dismiss the indictment should have been granted.

The order denying the motion to dismiss on double jeopardy grounds is reversed, and the case is remanded to the district court with directions to dismiss the indictment.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting, in which BOWMAN, MURPHY, and SMITH, Circuit Judges, join.

The essential difficulty that I see with the result that the court reaches today is that the Supreme Court in *Duro v. Reina*, 495 U.S. 676 (1990), did not base its decision on the Constitution, nor did the Constitution require the result that the Court reached there. The result in that case was instead based on federal common law, nothing more and nothing less, and in the ICRA amendments Congress exercised its plenary legislative power over federal common law in general and Indian affairs in particular to define the scope of inherent Indian sovereignty. In other words, Congress restored to the tribes a power that they had previously exercised but had lost over the years as a result of Supreme Court decisions. Because the Spirit Lake Nation, in trying Mr. Lara, was simply exercising its own sovereignty, and not a power that Congress delegated to it, Mr. Lara's double jeopardy rights were not violated.

## I.

According to current legal thought, Indian tribes possessed criminal jurisdiction over nonmember Indians as part of their full territorial sovereignty prior to colonization by us or our European predecessors. *See Duro*, 495 U.S. at 685-86. The Supreme Court held in *Duro*, however, that the Indians had lost this aspect of

their sovereignty because of their "dependent" status. *See id.*; *cf. Oliphant v. Squamish Indian Tribe*, 435 U.S. 191, 210 (1978).

The court opines in the present case that "[o]nce the federal sovereign divests a tribe of a particular power, it is no longer an inherent power and it may only be restored by delegation of Congress's power." This holding draws on statements in Supreme Court opinions that a tribe's inherent sovereignty consists of those aspects of sovereignty that the tribes "retained" despite the federal government's overriding sovereignty. *See, e.g., Duro*, 495 U.S. at 685. The court's apparent premise is that power cannot be a retained one once the Supreme Court holds that it no longer exists.

This premise, however, fails both as a matter of history and of logic. Historically, it misapprehends the materials that the Supreme Court has used over the years to fashion the relationship between the United States and Indian tribes; logically, it improperly assumes that there is only one way that a power can be retained. In my view, the ICRA amendments did not create a new tribal power out of whole cloth, it merely relaxed a common-law restriction on a power previously possessed. Regardless of the fact that the ICRA amendments are a "but-for" cause of the Spirit Lake Nation's ability to try Mr. Lara here (which of course they necessarily are), the origin of that power was not the ICRA amendments themselves but the full territorial sovereignty that the tribes possessed in the past. *Cf. Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 421-33, 437-38 (1946). Thus, the power at hand is a "retained" one, even if it had been rendered temporarily unavailable by decisions of the United States Supreme Court.

### A.

Three cases from the early nineteenth century, all of which Chief Justice Marshall wrote, provided a foundation for federal Indian law: *Johnson v. McIntosh*, 21 U.S. (8 Wheat) 543 (1823), *Cherokee Nation v. Georgia*, 30 U.S. (5 Peters) 1 (1831), and *Worcester v. Georgia*, 31 U.S. (6 Peters) 515 (1832). An examination

of these cases shows that in forging the legal relationship between Indian tribes and the government of the United States, "the Supreme Court in the Marshall trilogy embraced pre-constitutional notions of the colonial process, rooted in the law of nations, involving both inherent tribal sovereignty and a colonial prerogative vested exclusively in the centralized government." *See* Philip P. Frickey, *Domesticating Federal Indian Law*, 81 Minn. L. Rev. 31, 57 (1996). These principles, which the Supreme Court created from extra-constitutional sources, have "been consistently followed by the courts for more than a hundred years." *See* Felix S. Cohen, *Handbook of Federal Indian Law* 123 (1988); *cf.* Frickey, *supra*, at 58-60.

In *McIntosh*, 21 U.S. at 573, Chief Justice Marshall justified federal power over Indian tribes in terms of the right of discovery, a euphemism for the right of conquest, *see* Judith Resnik, *Multiple Sovereignties: Indian Tribes, States, and the Federal Government*, 79 Judicature 118, 119 (1995). That this right was universally recognized, he asserted, was "prove[d]" by "the history of America from its discovery to the present day." *McIntosh*, 21 U.S. at 574. As Judge Canby has explained, "[t]he principles of discovery were, of course, European (and, by adoption, federal) law [and] in Marshall's view that was the only kind of law that the Supreme Court could apply." William C. Canby, Jr., *Federal Indian Law* 69 (3d ed. 1998).

Eight years later in *Cherokee Nation*, 30 U.S. at 16-17, Chief Justice Marshall held that Indian tribes were foreign states, but ones with a special relationship to the United States, namely, that "of a ward to his guardian." In making this determination, the Chief Justice looked not to the Constitution but, as in *McIntosh*, to the uniform custom of nations and the history of our country's dealings with Indian tribes. *See id.* at 16-18. The next year in *Worcester*, 31 U.S. at 555, Chief Justice Marshall wrote that the relationship of the Cherokees to the United States "was that of a nation claiming and receiving the protection of one more powerful: not that of individuals abandoning their national character, and submitting as subjects to the laws of a

master." He then held that under international law the Indian tribes retained the right to self-government, because

> [t]he very fact of repeated treaties with them recognizes it; and the settled doctrine of the law of nations is, that a weaker power does not surrender its independence--its right to self-government, by associating with a stronger, and taking its protection. A weak state, in order to provide for its own safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state.

*Id.* at 560-61.

At the end of the century, the Court reaffirmed these sentiments in *United States v. Kagama*, 118 U.S. 375 (1886). A few years before that case, in *Ex Parte Crow Dog*, 109 U.S. 556 (1883), the Court had held that the murder of an Indian by another Indian in Indian country was within the sole jurisdiction of the tribe, and so federal territorial courts had no power over such a crime. Congress reacted by passing the Indian Major Crimes Act, 18 U.S.C. § 1153, declaring murder and other serious crimes committed by an Indian in Indian country to be federal offenses triable in federal court. In *Kagama*, the Court upheld the constitutionality of the act, despite the fact that the Constitution "is almost silent in regard to the relations of the government which was established by it to the numerous tribes of Indians within its borders," 118 U.S. at 378, and even though the Court was "not able to see in [any clause] of the constitution and its amendments any delegation of power to enact a code of criminal law for the punishment of [serious crimes]," *id.* at 379. Rather, the Court concluded, the legitimacy of the act derived from extra-constitutional sources, such as its necessity for the Indians' protection and the fact that the power to pass the act "must exist in th[e federal] government because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes." *Id.* at 384-85.

Unlike *Kagama*, which addressed the question of whether a grant of federal criminal jurisdiction in Indian country was consistent with the federal government's role as "guardian," *Oliphant*, *United States v. Wheeler*, 435 U.S. 313 (1978), and *Duro*, addressed the converse question, that is, whether the retention of certain criminal jurisdiction in Indian country was consistent with the Indian tribe's role as "ward." Despite this difference, all four cases reached their answers in the same way, namely, by reference to governmental custom and practice and to the general principles of the *jus gentium*. What is importantly missing from all of these cases is the slightest intimation that their outcome was dictated by some substantive constitutional principle.

In *Wheeler*, 435 U.S. at 324-26, for instance, the Court analyzed various statutes establishing federal criminal jurisdiction over crimes involving Indians, and described how these statutes had left in place tribal criminal jurisdiction over members as part of the inherent sovereign power of Indian tribes. In discussing why none of these statutes had divested the Indians of this power, the Court restated the sentiments expressed in *Worcester* that the " 'settled doctrine of the law of nations is, that a weaker power does not surrender its independence--its right to self-government, by associating with a stronger, and taking its protection.' " *See Wheeler*, 435 U.S. at 326 (quoting *Worcester*, 31 U.S. at 560-61). *Wheeler* thus quite clearly decided that tribes retained criminal jurisdiction over tribal matters as a matter of federal common law.

Although neither *Oliphant* nor *Duro* ever explicitly stated that it was a common-law decision, or referred to the law of nations, these decisions too were founded on federal common law. *See, e.g.*, Canby, *supra*, at 127; Philip P. Frickey, *A Common Law for our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers*, 109 Yale L.J. 1, 65 (1999); L. Scott Gould, *The Consent Paradigm: Tribal Sovereignty at the Millennium*, 96 Colum. L. Rev. 809,

853 (1996). In both cases, the Court analyzed history and governmental custom and devised from them the principle that, as a result of the dependent status of Indian tribes, tribal criminal enforcement power did not extend beyond internal relations among its members. *See Duro*, 495 U.S. at 685-92; *Oliphant*, 435 U.S. at 196-210; *cf. United States v. Enas*, 255 F.3d 662, 668-69 (9th Cir. 2001) (en banc), *cert. denied*, 534 U.S. 1115 (2002).

The Court in *Duro* did say that any power delegated to the tribes would be "subject to the constraints of the Constitution," 495 U.S. at 686, and that there would be due process concerns in subjecting nonmember Indians to trial in tribal courts because those courts did not provide constitutional protections as a matter of right, *see id.* at 693-94. But none of this can serve to convert *Duro* into a "constitutional" decision. A decision is "constitutional" only when it states, or necessarily implies, that the Constitution requires the result that it reaches.

In *Duro*, as in all cases, the Court had the obligation and the power under Article III to decide the case before it and "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Without any statute stating whether Indian tribes had criminal jurisdiction over nonmember Indians, it acted as a common-law court, using whatever sources were relevant and readily at hand to ascertain the applicable legal principles and to answer the question before it. As with all federal common law, however, Congress has the legislative authority to revise the result in *Duro* in whatever way it desires.

B.

The court holds that *Duro*'s distinction between inherent and delegated powers is of "constitutional magnitude." I take that to be a claim that *Duro* was based on the Constitution and, therefore, that the Court's determination in *Duro* of what constitutes inherent tribal sovereignty is final and binding on Congress. The court, however, never says precisely where in the Constitution principles of Indian sovereignty might

-14-

actually reside.  *Cf. United States v. Weaselhead*, 156 F.3d 818, 825 (8th Cir. 1998) (M.S. Arnold, J., dissenting).

The court does provide two possibilities.  First, it refers to "structural principles that are both implicit and explicit in the Constitution," citing *Duro* and *Seminole Tribe*.  The court, however, does not describe what these structural principles are, nor does it explain why they derived from the Constitution.  In fact, "no court has [ever] found a constitutionally protectible interest in tribal sovereignty itself," Canby, *supra*, at 85; and, "[t]o the extent that Indian tribes are discussed in the Constitution, they seem to be recognized as having a status outside its" perimeters, Judith Resnik, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts*, 56 U. Chi. L. Rev. 671, 691 (1989).

Perhaps the proposition that the court is urging is that since certain attributes of state sovereignty derive from the structure of the Constitution, *see, e.g.*, *Alden v. Maine*, 527 U.S. 706, 724 (1999), the perimeters of inherent tribal sovereignty must do so as well.  That proposition, however, fails to recognize the fact that "[u]nlike states, which ceded some sovereignty with the passage of the Constitution, Indian tribes did not."  Resnik, *Multiple Sovereignties*, *supra*, at 119.  The Indian tribes did not participate in the making of the Constitution, so its structure cannot tell us anything about the extent of their sovereignty.  *Cf. Worcester*, 31 U.S. at 555, 559-60; Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L. Rev. 881, 949 (1986).  Thus, as Chief Justice Marshall noted in *Worcester*, Indian nations, such as the Cherokees in *Worcester*, remained "distinct, independent political communities" even  after the adoption of  the Constitution.  *Worcester*, 31 U.S. at 559-61.  The status of Indian tribes in our constitutional order is thus more akin to that of foreign nations than to that of the states.

Second, the court points out that in recent years references to "non-constitutional sources of [Congress's plenary power] have largely been supplanted

by a reliance on the [Indian] commerce power." But the fact that the scope of the Indian commerce power has expanded in recent years and is now often seen as the source of legislation that regulates the Indians as dependent communities, *e.g.*, *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 531 n.6 (1998), does not mean that the traditional view of the origins of the relationship between Indian tribes and the United States has somehow been submerged. When pressed for a source of Congress's plenary authority, the Court tends increasingly to rely on the Indian commerce clause, I think, simply because in the particular context, it sees no need to look further.

The source of Congress's plenary power is in any case beside the point: Regardless of its source, it is well settled that Congress's power is plenary. It is a non sequitur to intimate that because the source of the plenary power *may* have changed from a "non-constitutional" to a constitutional source, Congress's ability to legislate is somehow circumscribed. If that were true, then Congress's authority would no longer be plenary. *Cf. Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903).

Even if the mere existence of the Indian commerce clause somehow restricted the powers that tribes inherently possess, moreover, inherent tribal sovereignty would still be a matter of federal common law. Consider, as an analogy, dormant commerce clause restrictions on state legislation that unduly burdens interstate commerce. A court can invalidate a state law on dormant commerce clause grounds, but Congress can reverse the court's decision and authorize the state to re-enact the legislation: Dormant commerce clause prohibitions are thus considered federal common law. *See, e.g.*, Adrian Vermeule, *Three Commerce Clauses? No Problem*, 55 Ark. L. Rev. 1175, 1175 (2003); *cf.* Frickey, *A Common Law*, *supra*, at 71-72. Thus, no matter how one views the matter, Congress retains legislative authority to determine prospectively what power tribes inherently possess.

## C.

The court also relies on *South Dakota v. Bourland*, 508 U.S. 679 (1993), a case that it notes was decided "subsequent to the ICRA amendments." The Supreme Court in that case did state that the exercise of tribal power beyond what is necessary to control internal relations is not inherent and therefore cannot survive without express congressional delegation, *see id.* at 694-95 & n.15, and our subsequent case law is replete with similar statements. But, as always, language must be understood in context, and the context in which these statements were made was different in a way that makes the present case legally distinguishable.

Although *Bourland* and some other cases that were decided after the ICRA amendments, *e.g.*, *Nevada v. Hicks*, 533 U.S. 353 (2001), have addressed inherent and delegated powers, they did not involve the amendments. The question raised here, namely, whether Congress could restore aspects of sovereignty to tribes, rather than delegate power to it, therefore did not arise in those cases and could not have been decided by them. It is only if Congress does not have the power to restore aspects of Indian sovereignty that delegation becomes the only option. In my opinion, the statements in cases such as *Oliphant* and *Duro* that the jurisdiction in question was not inherent and could only be delegated by Congress described what would be true absent the sort of legislation that we have before us. *Cf. Hicks*, 533 U.S. at 377 n.2 (Souter, J., concurring).

## II.

In reaching its conclusion, the court rejects a contrary result by a unanimous eleven-judge court in *Enas*, 255 F.3d 662. Though the rationales in the two opinions in that case differed somewhat, all of the judges agreed that the inherent sovereignty of Indian tribes was a matter of federal common law, not constitutional law. For the reasons that I have tried to explain, that conclusion seems to me to be ineluctable.

The basic question in this case is whether providing tribes with the inherent power to try nonmember Indians for crimes falls within Congress's plenary authority over Indian affairs (which the court agrees that Congress has). In light of the Supreme Court pronouncement that all "aspect[s] of tribal sovereignty ... [are] subject to plenary federal control and definition," *see Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 891 (1986), it seems to me that the only possible answer to that question is that Congress can do what it quite plainly sought to do here.

I therefore respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.