Thomas Lee MORRIS, a minor child, by and through his guardians, his natural parents, Elizabeth S. Morris and Roland J. Morris, Sr., Plaintiffs,

v.

Judge TANNER, Judge of the Confederated Salish and Kootenai Indian Tribal Court for the Flathead Reservation, Defendant,

and

United States of America, Intervenor.

No. CV 99–82–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Oct. 28, 2003.

---

### ORDER

MOLLOY, Chief Judge.

Before the Court are the United States' motion to dismiss and Plaintiff's and Defendant's motions for summary judgment. The State of Montana has filed an amicus curiae brief on behalf of the defendant.

### I. Background

Plaintiff Thomas Lee Morris and his parents Elizabeth and Roland challenge the constitutionality of the 1990 amendments to the Indian Civil Rights Act

(ICRA), 25 U.S.C. § 1301(2), which affirm tribal court jurisdiction over all Indians, not just Indians who are members of the prosecuting tribe.[1]

Morris is an enrolled member of the Chippewa Tribe from the Leech Lake Reservation in Minnesota. On June 13, 1999, he was cited for speeding near Ronan, Montana, on the Flathead Indian Reservation. Morris was ordered to appear in the Flathead Reservation Tribal Court. The Flathead Reservation is the home of the Confederated Salish and Kootenai Tribes ("CSKT" or the "Tribes"), in which Morris is not enrolled. Morris filed a motion to dismiss the tribal action against him. The motion was denied. He also filed an action for declaratory and injunctive relief in federal court, claiming the Tribes had no jurisdiction over him. The tribal defendants in the federal action filed a motion to dismiss, which was granted by this Court on October 5, 1999. This court's brief order relied on the 1990 Indian Civil Rights Act amendments. Morris appealed to the Ninth Circuit. On July 24, 2001, the Ninth Circuit reversed and remanded.

The Ninth Circuit's Memorandum states that this Court erred in not considering Morris' constitutional arguments regarding the 1990 Indian Civil Rights Act amendments. This Court did not fully consider whether the amendments violated Morris' equal protection rights under the Due Process Clause, and whether they violate the principle of separation of powers. The Ninth Circuit remanded for consideration of these issues, as well as of whether there is a due process claim aside from equal protection. The heart of the Ninth Circuit's direction reads "the district court should consider whether the term 'Indian' as used in the 1990 amendments amounts to a political or racial classifica-tion." If the classification is racial, the amendments must pass strict scrutiny. If it is political, the amendments are subject to rational basis review. "The district court should further consider the reach of the 1990 amendments, and whether the amendments apply to 'Indians' who are not enrolled in, or otherwise affiliated with, any tribe." The 9th Circuit further directed this court to consider whether the amendments violate the doctrine of separation of powers under its ruling in *United States v. Enas*, 255 F.3d 662 (9th Cir.2001).

Plaintiff's Complaint includes the following counts: Count I (Federal Common Law), that CKST lacks retained inherent sovereign jurisdiction over non-members of the Tribes for criminal prosecution; Count II (Constitutional Due Process), that the prosecution, whether derived from the amendments or federal common law, violates Morris' right to due process, because the tribal court is not subject to the Bill of Rights; Count III (Constitutional Equal Protection), that the prosecution violates Morris' equal protection rights because it is based on race distinctions; and Count IV (Separation of Powers), that the amendments are unconstitutional because Congress' affirmation of tribal jurisdiction violates the separation of powers doctrine.

## II. Parties' Arguments

### A. The United States' Motion to Dismiss

The U.S. entered this case as an Intervenor following the remand from the Ninth Circuit, in order to argue on behalf of the constitutionality of an Act of Congress. The U.S.'s motion to dismiss tracks the questions posed by the Ninth Circuit. In sum, the motion states that the ICRA amendments are reviewed under rational basis, since Indians[2] are a political and not

---

**1.** Morris was a minor at the commencement of this lawsuit so his parents appeared as his guardians. He has now reached the age of majority.

**2.** The term "Indian" is used advisedly in this

racial classification; there is a rational basis for the law; and therefore, there is no constitutional infirmity.

First, Acts of Congress are presumed constitutional. U.S.'s Mot. to Dismiss Br., 10–11. Acts of Congress relating to Indian affairs are given particular deference. *Morton v. Mancari,* 417 U.S. 535, 551–555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The U.S. Supreme Court has upheld the constitutionality of Congressional acts that distinguish Indians from other groups. *United States v. Antelope,* 430 U.S. 641, 645, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977).

Acts singling out Indians are therefore subject to rational review, based on Indians as a political class, rather than strict scrutiny based on Indians as a racial group. U.S.'s Mot. to Dismiss Br., 12; *Antelope,* 430 U.S., at 645–650, 97 S.Ct. 1395; *Fisher v. District Court,* 424 U.S. 382, 391, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Mancari,* 417 U.S. at 555, 94 S.Ct. 2474. "Indian" is defined in ICRA as the same as under 18 U.S.C. § 1153, which has been interpreted in common law as membership in or affiliation with a federally recognized tribe. *LaPier v. McCormick,* 986 F.2d 303, 305 (9th Cir.1993); U.S.'s Mot. to Dismiss Br., 13–14. The ICRA amendments are rationally related to the government's goals of Indian self-governance and law enforcement on the reservations. U.S.'s Mot. to Dismiss Br., 15–16. In addition, so many non-member Indians live on reservations and partake of tribal services that it is rational for the criminal laws to apply to them as well, in a comprehensive scheme of reservation life. U.S.'s Mot. to Dismiss Br., 16.

The United States' second argument is that Morris fails to state a claim because the ICRA amendments do not violate due process. U.S.'s Mot. to Dismiss Br., 17–18. By being a tribal member, one chooses to be subject to ICRA in tribal court, not the Bill of Rights.

The United States' final argument is that the ICRA amendments do not violate separation of powers because Congress had the power, due to its control over federal common law, to enact legislation that contradicted the decision of the Supreme Court. Congress has also always had plenary authority over Indian affairs. U.S.'s Mot. to Dismiss Br., 19.

**B. Defendant's Motion for Summary Judgment**

The Tribal Defendant, Judge Winona Tanner, has moved for summary judgment. Her argument contains five parts: 1.) the Tribes may prosecute Morris as a function of their retained inherent sovereign powers; 2.) the comprehensive tribal, state, and federal criminal prosecution scheme is consistent with the U.S. Constitution and reflects the unique status of Indian tribes' sovereignty; 3.) the Ninth Circuit has determined Morris' claim is a facial challenge to the statute, and he can not meet the burden of proving such a claim; 4.) Morris cannot bring an as-applied challenge because he has not exhausted his tribal remedies, it is beyond the scope of federal judicial review of tribal courts, and he has failed to submit his claim to the President for arbitration as required by his tribe's treaty with the U.S.; and 5.) justice in Indian country is best served by this jurisdictional scheme. Def.'s Sum. Judg. Br., 2.

Judge Tanner starts out by clarifying the procedural posture of Morris' claims before this Court, following remand from the Ninth Circuit. The Tribes conclude that Morris' fourth claim, regarding the

order. No disrespect is intended toward those who prefer the term Native American. Indian is used here because of the statutory

and common law terminology, as well as the self-identification of many members of the CSKT.

Tribal Court's inherent jurisdiction over him as a non-member Indian and whether such jurisdiction violates the doctrine of separation of powers, was decided by the Ninth Circuit's opinion in *U.S. v. Enas;* therefore, Morris' claim is moot in this Court. Def.'s Sum. Judg. Br., 5.

The Tribes' substantive arguments are as follows. First, the Tribes possess an inherent sovereign power to prosecute Morris. This power comes from two sources. First, the Tribes retained the power to prosecute by the terms of the Hellgate Treaty. Def.'s Sum. Judg. Br., 6. The Tribes possessed a form of judicial function prior to the Hellgate Treaty, and the Treaty preserved to them their exclusive use and benefit of the Flathead Reservation. Treaties were a grant of rights *from* the Tribes, not an assignment of rights *to* them. *United States v. Washington,* 157 F.3d 630 (9th Cir.1998); *United States v. Winans,* 198 U.S. 371, 380–82, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Therefore, the Tribes never gave up their judicial authority over the Flathead Reservation.

Second, federal law affirms the right of the Tribes to prosecute Indians. Def.'s Sum. Judg. Br., 7. Powers not explicitly withdrawn from tribes by Congress are retained, unless those powers are withdrawn by implication as a necessary result of the Tribes' dependent status. *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 202–03, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); *United States v. Wheeler,* 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), the United States Supreme Court held that tribes' sovereign powers did not include the authority to prosecute non-member Indians, while acknowledging that Congress has ultimate authority over Indian affairs. *Duro,* at 698, 110 S.Ct. 2053. Congress responded to this decision by passing the 1990 amendments to the Indian Civil Rights Act, finally enacted as P.L. 102–137, 105 Stat. 646 (1991); 25 U.S.C. §§ 1301–1303. With this amendment, Congress chose to "recognize and affirm" tribal misdemeanor prosecutorial authority over "all Indians on their respective reservations." H.R. Conf. Rep. 101–938, 101st Cong.2d Sess. 132 (1990). Defendant claims that by drafting the law this way, Congress avoided impermissibly delegating prosecutorial power to the Tribes, but rather enabled it. *United States v. Enas,* 255 F.3d 662, 673–75 (9th Cir.2001). In *Enas,* the Ninth Circuit wrote that the "1990 amendments are therefore appropriately characterized as a recognition and confirmation of the tribes' inherent sovereign criminal jurisdiction over all Indians." *Enas,* at 679. See also *United States v. Lara,* 324 F.3d 635 (8th Cir.2003), cert. granted (Sept. 30, 2003); *United States v. Weaselhead,* 165 F.3d 1209 (8th Cir.1999). Defendant claims that *Enas* disposes of Morris' first and fourth claims.

Defendant's second major argument is that the tribal prosecution scheme is consistent with the U.S. Constitution. Def.'s Sum. Judg. Br., 9. Defendant argues that Indian law is unique, and due process and equal protection claims have repeatedly failed in the area of Indian law. Def.'s Sum. Judg. Br., 9. *United States v. Archambault,* 174 F.Supp.2d 1009, 1023 (D.S.D.2001). A keystone to this argument is the holding in *Morton v. Mancari* that "Indian" is a political rather than racial designation. 417 U.S. 535, 552–54, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). *See also U.S. v. Antelope,* 430 U.S. 641, 642–50, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977).

To fall under the jurisdiction of the Confederated Salish and Kootenai tribal court, a defendant must be "an enrolled member of a federally-recognized tribe." Def.'s

Sum. Judg. Br., 10; Memo. of Agreement for Retrocession of Criminal Misdemeanor Jurisdiction Between State of Montana, et al., and the Confederated Salish and Kootenai Tribes, 3 ("For purposes of the Agreement an 'Indian' is a person who is an enrolled member of a federally-recognized tribe."). Indian status for federal criminal jurisdiction requires voluntary membership or affiliation with a federally recognized tribe, in addition to an ancestral or racial element. *LaPier v. McCormick,* 986 F.2d 303–305 (9th Cir.1993); *United States v. Heath,* 509 F.2d 16, 19 (9th Cir.1974); *United States v. Rogers,* 45 U.S. 567, 4 How. 567, 11 L.Ed. 1105 (1846). Therefore, an individual's subjection to tribal criminal jurisdiction is voluntary, because one can give up one's tribal enrollment; one cannot relinquish one's race.

Further, tribes themselves are not constrained by the Bill of Rights in the same fashion as other sovereign bodies in the United States. Def.'s Sum. Judg. Br., 11; *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The Indian Civil Rights Act was passed to impose most of the constraints of the Bill of Rights on tribes, with a few exceptions. Def.'s Sum. Judg. Br., 11.

The CSKT have also enacted a federally-approved tribal code, thereby providing sufficient protection to the rights of defendants brought before the tribal court. Def.'s Sum. Judg. Br., 12. In addition, the State of Montana, which did have concurrent jurisdiction over reservation misdemeanors under Public Law 280, retroceded this jurisdiction to the tribes in 1994, returning to the CSKT the authority to prosecute member and non-member Indians on the Reservation for traffic violations such as Morris'. Def.'s Sum. Judg. Br., 13. The Memorandum of Agreement for Re-

trocession between Montana and the CSKT evinces a clear intent to distribute the law enforcement and judicial duties among the three sovereigns. Def.'s Sum. Judg. Br., 13. The United States Bureau of Indian Affairs accepted this Retrocession. 60 Fed.Reg. 33318 (June 27, 1995).

Tanner's third major argument is that the Ninth Circuit Court of Appeals construed Morris' challenge as a facial challenge to the 1990 amendments, and that Morris cannot carry the burden that challenge imposes. Br., 14. The Ninth Circuit concluded that Morris was not challenging his particular prosecution in the CSKT court, but rather the constitutionality of the 1990 amendments altogether.[3] A facial challenge to an act requires a litigant to prove there would be no set of circumstances under which the Act is valid. *U.S. v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Br., 14. Tanner then argues that if the amendment is constitutionally sound as applied to Morris, then he is not permitted to argue that it might not apply constitutionally to another litigant. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Br., 14. Tanner argues that this point dispenses with Morris' second and third claims, because Morris' prosecution does not violate his due process and equal protection rights under the Fifth Amendment. Br., 15.

Tanner's fourth major point is that Morris' claim cannot go forward as an as-applied challenge, because his prosecution has been stayed in tribal court pending this suit over the constitutionality of the amendments. His tribal action has not been fully adjudicated so his claims there are not exhausted. Federal review is inappropriate. Def.'s Sum. Judg. Br., 15–16;

---

**3.** The specific question of Morris' prosecution by CSKT was the basis for this Court's October 5, 1999 dismissal order.

*National Farmers Union Ins. Companies v.Crow Tribe of Indians,* 471 U.S. 845, 856, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 14, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). Further, the exclusive route of an as-applied challenge to the ICRA amendments is through a petition for habeas corpus under 25 U.S.C. § 1303. Def.'s Sum. Judg. Br., 17. Tanner argues that Morris could only avoid tribal exhaustion by framing his claim as a facial challenge. Def.'s Sum. Judg. Br., 17; *Morris v. Tanner,* 99–36007, 16 Fed.Appx. 652, 655 (9th Cir.(Mont.) Aug. 15, 2001.) Third, the Chippewa Tribe's Treaty with the U.S. requires that the tribe and its members (of which Morris is one) "submit all difficulties between them and other Indians to the President and to abide by his decision in regard to the same ..." Def.'s Sum. Judg. Br., 18; 1855 Treaty with the Chippewa, Art. 9., 10 Stat. 1165 (Feb. 22, 1885), 1855 WL 5610 (Trty).

Tanner's final argument is that the current jurisdictional scheme, allowing tribal jurisdiction over non-member Indians, is in the best interest of public health and safety in Indian Country. This conclusion was the basis of Congress' *Duro* Fix, in order to avoid a prosecutorial void over these Indians on reservations such as the Flathead. H.R.Rep. No. 61, 102nd Cong., 1st Sess., 372–73 (1991); Def.'s Sum. Judg. Br., 18. Also, allowing this jurisdiction comports with other safety and welfare programs on the reservation. Def.'s Sum. Judg. Br., 19.

Plaintiff responded to both the United States' motion to dismiss and Tanner's motion for summary judgment in the same brief. Plaintiff has two primary arguments. First, the 1990 ICRA amendments rely on a racial distinction and therefore are unconstitutional on their face. Pl.'s Response Br., 5. Morris claims that his position does not depend on *Mor-*

*ton v. Mancari* being reversed. Pl.'s Response Br., 8 n. 8. "... [T]he 1990 amendments, uniquely among federal enactments, impose heavy burdens on nonmember Indians while not imposing similar burdens on nonmember non-Indians, who are similarly situated in relation to Tribes." Pl.'s Response Br., 7. Morris relies on *Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), and *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), for elucidation of the strict scrutiny required of all laws distinguishing citizens on the basis of race. Pl.'s Response Br., 7–8. Plaintiff also relies heavily on a law review article that argues that the *Duro* Fix was unconstitutional. L. Scott Gould, *The Congressional Response to Duro v. Reina: Compromising Sovereignty and the Constitution,* 28 U.C. Davis L.Rev., 53, 63 (1994); Pl.'s Response Br., 9. Plaintiff also argues that Congress may not violate the Constitutional rights of individual Indians as citizens of the United States, despite whatever authority Congress might have over *tribes.* Pl.'s Response Br., 13.

Plaintiffs' second main argument is just that Tanner failed to address and that the United States has "essentially conceded" Morris' due process claim. Pl.'s Response Br., 14.

### C. Plaintiff's motion for summary judgment

Morris has also moved for summary judgment, arguing almost the identical points of his response above. The motion addresses three questions: 1.) do the 1990 Amendments violate Fifth Amendment equal protection guarantees because they are a racial classification; 2.) do they violate Fifth Amendment due process rights because they allow tribes to punish citizens without the protection of the U.S. Consti-

tution; and 3.) do they violate the principle of the separation of powers? [4]

Morris argues that this court's review of the 1990 amendments must be under strict scrutiny, since "Indian" is a racial rather than political designation. The amendments single out a race, non-member Indians, for negative treatment. Pl.'s Response Br., 11. ICRA's definition of Indian is not limited to enrolled members of tribes, but to Indians more generally. "[T]he 1990 amendments rely on the definition of Indian developed by cases under 18 U.S.C. § 1153." Pl.'s Response Br., 12. Morris cites *U.S. v. Broncheau*, 597 F.2d 1260, 1262–63 (9th Cir.1979), *U.S. v. Ives*, 504 F.2d 935, 953 (9th Cir.1974), *vacated on other grounds*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), and *Ex parte Pero*, 99 F.2d 28, 31 (7th cir.1938) for the proposition that enrollment alone does not define Indian for application of § 1153. Morris focuses on the fact that to be an Indian in these terms, one must most likely possess some Indian blood. Therefore it is a racial distinction.

Plaintiff further relies on the U.S. Supreme Court's opinions in *Adarand Constructors, Inc. v. Pena, supra,* and *Rice v. Cayetano, supra,* to claim that a statute like this one, that relies on racial classifications, must withstand strict scrutiny.

Plaintiff emphasizes the part of *Adarand* that says laws that impose a special burden on members of a minority are particularly abhorrent. Pl.'s Response Br., 15–16. "They are just the type of federal action burdening a distinct, disfavored minority that all the justices in *Adarand*

agreed require strict scrutiny. Their effect is most certainly to 'perpetuate a caste system.'" Pl.'s Response Br., 16.

Finally, Plaintiff claims that the ICRA amendments violate the Fifth Amendment right to due process because they subject citizens to criminal prosecution without the protections of the U.S. Constitution. Pl.'s Response Br., 18. Plaintiff relies on *Duro v. Reina* for the idea that tribal punishment is such a violation. Pl.'s Response Br., 18.

### IV. Analysis

#### A. Standard for Summary Judgment

The material facts are not in dispute.[5] Rather, this conflict is over the constitutionality of an Act of Congress. The record includes a number of documents beyond the pleadings. Pursuant to Fed. R.Civ.P. 12(b), the United States' Motion to Dismiss will be treated as a motion for summary judgment. Therefore there are three motions for summary judgment pending before the Court.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party must establish that no genuine issue of material fact exists. A material fact is one that is relevant to an element of a claim or defense, and its materiality is determined by the substantive law governing the claim or defense.

---

4. Morris recognizes in his brief that the United States Court of Appeals for the Ninth Circuit decided this question in its opinion in *United States v.Enas.* 255 F.3d 662, (2001), but retained this question in his brief in order to "preserve their claim."

5. Plaintiff filed a statement of uncontroverted facts that falls far outside the bounds of what

is appropriate under Local Rule 56.1 and contains considerable legal argument. Defendants have objected to these facts. Defendants' objections, to the extent they refute legal conclusions, are well-founded. However, the facts underlying this Court's conclusions are not in dispute.

*T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). Once a moving party meets its burden that no genuine issues of material fact exist, the burden shifts to the party opposing summary judgment to show specific material facts which remain at issue. *Kaiser Cement Corp. v. Fischbach & Moore,* 793 F.2d 1100, 1103–1104 (9th Cir.1986).

## B. The Ninth Circuit's Remand

### 1. Do the ICRA amendments violate Morris' Fifth Amendment equal protection rights?

■ The Ninth Circuit's direction on remand to this Court orders first that this Court determine whether Indian, as used in the 1990 amendments and ICRA statute, is a political or racial distinction. Plaintiff argues fervently that it is a racial distinction, based on the fact that some form of racial component is an element of the definition of Indian, in addition to membership in a federal tribe. Morris argues that the fact that he, a non-member Indian, is subject to CSKT tribal jurisdiction, and a non-Indian, non-member is not, creates a racially-based distinction in prosecution.

The United States Supreme Court explained in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), that Indian for the purpose of federal legislation is a political rather than racial designation.[6] As the Supreme Court explained in *U.S. v. Antelope,* federal regulation of Indian crimes was "rooted in the unique status of Indians as 'a separate people' with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a ' "racial group" consisting of "Indians"...' ". 430 U.S. at 646, 97 S.Ct.

1395 (citation omitted.) *See also U.S. v. Keys,* 103 F.3d 758, 761 (9th Cir.1996); *Fisher v. District Court,* 424 U.S. 382, 390–91, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976). The distinction is somewhat confusing, of course, because blood quantum is usually an element of tribal membership. However, in this particular instance, CKST policy prescribes that tribal prosecutions of "Indians" means federally-enrolled Indians. Memo. of Retrocession, 3. Racial appearance as an Indian is not enough, and conversely, there are clearly many CKST members who do not appear racially Indian but who are enrolled members of the tribe.

Further, the voluntary nature of tribal membership, like citizenship, is crucial to keep in mind. While one might be unhappy to relinquish one's tribal membership in order to avoid future prosecution by a tribal court, one could still do so. One could never give up one's race in the same way, and in fact, much of the equal protection law in this country is founded on an aversion to disadvantage based on involuntary, immutable characteristics.

■ The political versus racial distinction is not intuitively grasped. However, a consideration of the mutual history of Indian tribes and European settlers on this continent illuminates the distinction between the treatment of Indians as a political entity and the treatment of, say, African–Americans as a racial group. Indians were here, with fully functioning governmental and juridical institutions, before their contact with European settlers. As time passed, phases of contact, combat, and conquest resulted in varying degrees of negotiation and power struggle between the Europeans and Indians. This situation is entirely distinct from the situation of Africans who were brought to this country

---

**6.** Plaintiff cites a number of cases or situations in which the conclusion of *Morton v. Mancari* is questioned. See, e.g., Pl.'s Sum.

Judg. Br., 16. However, it is not the place of this court to predict the future but rather to abide by the law as it now stands.

enslaved and deprived of their governmental structures before arrival. The rhetoric of race relations derived from the history of African–Americans is only partially applicable to the situation of Indians, and to overlook the crucial differences minimizes the great respect owed to the remaining sovereignty of tribes. Indian tribes gave up many of their rights by treaty and reserved much to themselves that would not conflict with the expanding United States. Over time, much of what was reserved has been taken, through Congressional legislation and through legal decisions. However, what was not taken, by law remains. *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 202–08, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).

▆▆▆ Plaintiff relies on *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), and *Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), to bolster his argument that this distinction is racial. *Rice* and *Adarand* are, as Plaintiff argues, useful clarifications of the strict scrutiny applied to laws that make racial distinctions. However, as that is not the case here, they are beside the point.[7]

Further, neither case deals directly with any Indian law questions. The majority in *Rice* had the opportunity to analogize the situation of Hawaiians to Indian law, as the State of Hawaii urged them to, and explicitly chose not to. *Rice,* 528 U.S. at 518, 120 S.Ct. 1044. Any discussion of Indian law in that case is in the form of counterpoint or distinction, as dicta, and is not the holding of the case. *Adarand* is also beside the point. The issue in *Adarand* was what means a government could use to remedy racial discrimination. The issue here is preservation, in accordance with the United States' trust obligation, the independent, quasi-sovereign status of Indian nations.

Since the distinction is political, rather than racial, the 1990 amendments are subject to rational basis review. The record is clear that the law easily passes the test. There are significant numbers of nonmembers Indians on the Flathead Reservation. U.S. Br., 16 (citing the House Hearing in which the CKST Tribal chair claimed 2000 + nonmember Indians on the Flathead reservation). The law needs to be enforced against them. The state of Montana does not exercise jurisdiction over Indians on the reservation for regulatory actions, such as speeding tickets and DUIs.[8] The tribes have misdemeanor jurisdiction and jurisdiction of these regulatory violations over Indians on the reservation. 25 U.S.C. 1302(7).[9] If this jurisdiction were limited to member Indians, large

---

7. I conclude that Indian is a political distinction, based on the *Morton v. Mancari* line of cases. However, even were Indians simply a racial group, I conclude that the ICRA amendment would easily pass strict scrutiny. Strict scrutiny of a racial distinction requires that the legislation is a narrowly tailored measure that furthers a compelling governmental interest. *Adarand* at 227, 115 S.Ct. 2097. The United States and the tribal governments have compelling interests in the self-governance of the tribes, the public health, safety, and welfare of the reservations, and effective and thorough law enforcement on the reservations. The ICRA amendments are necessary and narrowly tailored to meet those needs.

8. The Flathead Reservation is unique in the state of Montana as a P.L. 280 reservation, on which the state was authorized to prosecute felonies. The federal government maintains its exclusive prosecutorial jurisdiction on Montana's other reservations, under the Major Crimes Act. The difference does not matter in this instance; however, the ICRA amendments are intended to apply uniformly across Indian country.

9. This limitation on tribes is implicit in the law that restricts punishments the tribal courts can impose to one year maximum in jail.

numbers (perhaps 2000) of residents of the reservation could commit misdemeanor crimes and regulatory violations without any risk of prosecution. The basis of Congress' *Duro* Fix was to avoid a jurisdictional prosecutorial void over these Indians on reservations such as the Flathead. H.R. Rpt. 102–61, 3–4 (1991); S. Rpt. 102–168, 1, 3; S. Rpt. 102–153, 7 (1991); U.S. Br., 15–16, 18.

In addition, non-members Indians have access to BIA health and social services on the reservation, and the CKST must dispense these services to CKST and other non-CSKT tribal members "fair[ly] and uniform[ly]." 25 U.S.C. § 450j(h). Non-members also receive police and fire services while on the Reservation and other benefits of tribal government. Therefore, the benefits they receive by living on Flathead are counterbalanced by the burden of submitting to CKST tribal jurisdiction. Further, all tribes benefit by the United States' expressed desire and policy to further self-governance and uphold its treaty obligations, wherever the tribes' individual members may reside.[10]

### 2. Is there a due process claim other than equal protection?

■ The Ninth Circuit also directed this Court to consider whether Morris had a due process claim separate from his equal protection claim. Count II of Morris' complaint appears to be a due process Bill of Rights claim, arguing that the tribal court cannot prosecute a citizen without that citizen having the protection of the Bill of Rights. However, all Indians are also citizens of the United States. Congress, in

allowing tribal courts to prosecute Indians and in developing ICRA in the first place, has developed a scheme that respects the quasi-sovereign status of tribes and their inherent authority but also assures individuals of their rights in tribal courts. ICRA contains all of the constitutional measures that protect federal defendants except that one may be tried before a jury of six, and grand jury presentment is not required. 25 U.S.C. § 1302. Further, ICRA does contain a habeas corpus provision that allows defendants in tribal court to petition a federal court in the case of illegal detention by a tribal court. 25 U.S.C. § 1303. The United States Supreme Court determined in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), that ICRA may result in Indians being subject to tribal laws that would not be constitutionally sound if passed by a state or federal entity, due to Congress' plenary power over Indian affairs and the unique status of reservation Indians.

In any case, Morris' argument about a Seminole being hauled into another tribe's court for which he did not vote is misleading. Pl.'s Response Br., 13. Non–Indian citizens are called into courts of other states all the time, brought before judges whom they did not elect and subject to laws they may not support. That is what ICRA is for, to provide assurances that individuals will have a mechanism through which to receive protection against unjust prosecution and detention. Morris' situation does differ insofar as a Seminole may never be allowed to vote in a CSKT election, whereas a resident of another state can change residencies and gain the right to vote.[11] But the mere application of laws

---

10. The Ninth Circuit also directed this Court to consider "whether the amendments apply to 'Indians' who are not enrolled in, or otherwise affiliated with, any tribe". That question need not be answered to decide the matter at hand, and a consideration of it would be advisory. There would likely be a constitutional problem with such a situation, but it is not at hand here.

11. Convicted felons often lose their rights to vote permanently, yet are still, of course, subject to the laws established by representatives for whom they are barred from voting.

by another sovereign is not, in itself, a violation of one's rights. ICRA provides a sufficient floor of rights that protects all Indians of all tribes no matter in which tribal court they find themselves and provides them a mechanism for federal review with complete constitutional protection.

### 3. Do the ICRA amendments violate the principle of separation of powers?

The Ninth Circuit also directed this Court to determine whether the 1990 amendments violate the principle of separation of powers, considering the Circuit's decision in *U.S. v. Enas.* In *Enas,* the Ninth Circuit concluded, contrary to its earlier decision in *Means v. Northern Cheyenne Tribal Court,* 154 F.3d 941 (9th Cir.1998), that the ICRA amendments were an affirmation of tribal power, and that Congress was authorized to pass the law, because the Supreme Court's opinion rested on federal common law and not the Constitution. *Enas,* 255 F.3d, at 673–74. Congress therefore legally exercised its power in passing the amendments. 255 F.3d at 675. The 8th Circuit reached the same conclusion in *U.S. v. Lara,* 324 F.3d 635 (8th Cir.2003).

In addition, Supreme Court jurisprudence has consistently held that Congress has plenary authority over Indian affairs. *Morton v. Mancari,* 417 U.S. at 551–52, 94 S.Ct. 2474; *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 83–84, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299 (1903). Therefore, this law does not violate the principle of separation of powers.

### 4. Does the CKST have inherent power to prosecute Morris?

. Morris's Claim I concerns the inherent power of the Tribes to prosecute Morris. Morris says that this claim is not before the court anymore because the Ninth Circuit had decided that it was undisputed that the court could not prosecute Morris without the amendments. Pl. Sum. Judg. Br., 5 n. 5. However, that is not the conclusion I draw—*Duro* had withdrawn the power, or appeared to, and the amendments reaffirmed its existence. *Enas,* 255 F.3d, at 669–71. Indeed, without Congressional action, the state of the law would be as the Supreme Court determined it to be in *Duro.* However, Congressional action revived the law (or the power) as it was before the *Duro* decision. The Tribal Defendants dealt with this claim accurately at page 3 of their Response to Morris' Brief in support of Summary Judgment. Therefore, Defendant will be granted summary judgment on Claim One.

For the foregoing reasons, it is HEREBY ORDERED that the United States' motion to dismiss (**dkt # 60**) is GRANTED, the Defendant's motion for summary judgment (**dkt # 65**) is GRANTED, and the Plaintiff's motion for summary judgment (**dkt # 53**) is DENIED.

The Clerk of Court is directed to enter judgment in favor of the Defendant.