# UNITED STATES *v.* LARA

No. 03–107.   Argued January 21, 2004—Decided April 19, 2004

194

*Deputy Solicitor General Kneedler* argued the cause for the United States.  On the briefs were *Solicitor General Olson, Assistant Attorney General Wray, Deputy Solicitor General Dreeben, Barbara McDowell,* and *Richard A. Friedman.*

*Alexander F. Reichert,* by appointment of the Court, 540 U. S. 980, argued the cause for respondent.   With him on the brief were *Ronald A. Reichert* and *James E. Smith.\**

*Briefs of *amici curiae* urging reversal were filed for the State of Idaho et al. by *Lawrence G. Wasden,* Attorney General of Idaho, and *Clay R. Smith,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.,* of Alabama, *Richard P. Ieyoub* of Louisiana, *Jon Bruning* of Nebraska, *Larry Long* of South Dakota, and *Mark L. Shurtleff* of Utah; for the State of Washington et al. by *Christine O. Gregoire,* Attorney General of Washington, *Robert K. Costello,* Deputy Attorney General, and *William Berggren Collins,* Senior Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Terry Goddard* of Arizona, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Michael A. Cox* of Michigan, *Mike McGrath* of Montana, *Patricia A. Madrid* of New Mexico, and *Hardy Myers* of Oregon; for the Spirit Lake Sioux Tribe of North Dakota et al. by *Tracy Labin, Richard Guest,* and *Charles A. Hobbs;* and for the National Con-

JUSTICE BREYER delivered the opinion of the Court.

This case concerns a congressional statute "recogniz[ing] and affirm[ing]" the "inherent" authority of a tribe to bring a criminal misdemeanor prosecution against an Indian who is not a member of that tribe—authority that this Court previously held a tribe did not possess. Compare 25 U. S. C. § 1301(2) with *Duro* v. *Reina*, 495 U. S. 676 (1990). We must decide whether Congress has the constitutional power to relax restrictions that the political branches have, over time, placed on the exercise of a tribe's inherent legal authority. We conclude that Congress does possess this power.

I

Respondent Billy Jo Lara is an enrolled member of the Turtle Mountain Band of Chippewa Indians in north-central North Dakota. He married a member of a different tribe, the Spirit Lake Tribe, and lived with his wife and children on the Spirit Lake Reservation, also located in North Dakota. See Brief for Spirit Lake Sioux Tribe of North Dakota et al. as *Amici Curiae* 4–5. After several incidents of serious misconduct, the Spirit Lake Tribe issued an order excluding him from the reservation. Lara ignored the order; federal officers stopped him; and he struck one of the arresting officers. 324 F. 3d 635, 636 (CA8 2003) (en banc).

The Spirit Lake Tribe subsequently prosecuted Lara in the Spirit Lake Tribal Court for "violence to a policeman." *Ibid.* Lara pleaded guilty and, in respect to that crime, served 90 days in jail. See *ibid.*; Tr. of Oral Arg. 28.

---

gress of American Indians by *Carter G. Phillips, Virginia A. Seitz*, and *Riyaz A. Kanji.*

Briefs of *amici curiae* urging affirmance were filed for Lewis County, Idaho, et al. by *Tom D. Tobin* and *Kimron Torgerson;* for the Citizens Equal Rights Foundation by *Randy V. Thompson;* and for the National Association of Criminal Defense Lawyers by *Virginia G. Villa* and *Joshua L. Dratel.*

*Jon Metropoulos* filed a brief of *amici curiae* for Thomas Lee Morris et al.

After Lara's tribal conviction, the Federal Government charged Lara in the Federal District Court for the District of North Dakota with the federal crime of assaulting a federal officer. 324 F. 3d, at 636; 18 U. S. C. § 111(a)(1). Key elements of this federal crime mirror elements of the tribal crime of "violence to a policeman." See Brief for United States 7. And this similarity between the two crimes would *ordinarily* have brought Lara within the protective reach of the Double Jeopardy Clause. U. S. Const., Amdt. 5 (the Government may not "subject" any person "for the same offence to be twice put in jeopardy of life or limb"); 324 F. 3d, at 636. But the Government, responding to Lara's claim of double jeopardy, pointed out that the Double Jeopardy Clause does not bar successive prosecutions brought by *separate sovereigns*, and it argued that this "dual sovereignty" doctrine determined the outcome here. See *Heath* v. *Alabama*, 474 U. S. 82, 88 (1985) (the Double Jeopardy Clause reflects the "common-law conception of crime as an offense against the sovereignty of the government"; when "a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences'").

The Government noted that this Court has held that an Indian tribe acts as a separate sovereign when it prosecutes its *own members*. *United States* v. *Wheeler*, 435 U. S. 313, 318, 322–323 (1978) (a tribe's *"sovereign* power to punish *tribal* offenders," while subject to congressional "defeasance," remains among those "'inherent powers of a limited sovereignty which has never been extinguished'" (emphasis added and deleted)). The Government recognized, of course, that Lara is not one of the Spirit Lake Tribe's *own* members; it also recognized that, in *Duro* v. *Reina, supra,* this Court had held that a tribe no longer possessed *inherent or sovereign authority* to prosecute a "nonmember Indian." *Id.,* at 682. But it pointed out that, soon after this Court decided *Duro,* Congress enacted new legislation specifically

authorizing a tribe to prosecute Indian members of a different tribe. See Act of Nov. 5, 1990, §§ 8077(b)–(d), 104 Stat. 1892–1893 (temporary legislation until September 30, 1991); Act of Oct. 28, 1991, 105 Stat. 646 (permanent legislation). That new statute, in permitting a tribe to bring certain tribal prosecutions against nonmember Indians, does not purport to delegate the Federal Government's own *federal* power. Rather, it enlarges the *tribes'* own " 'powers of self-government' " to include "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over *all* Indians," including nonmembers. 25 U. S. C. § 1301(2) (emphasis added).

In the Government's view, given this statute, the Tribe, in prosecuting Lara, had exercised its own inherent *tribal* authority, not delegated *federal* authority; hence the "dual sovereignty" doctrine applies, *Heath, supra,* at 88; and since the two prosecutions were brought by two different sovereigns, the second, federal, prosecution does not violate the Double Jeopardy Clause.

The Federal Magistrate Judge accepted the Government's argument and rejected Lara's double jeopardy claim. 324 F. 3d, at 636–637. An Eighth Circuit panel agreed with the Magistrate Judge. 294 F. 3d 1004 (2002). But the en banc Court of Appeals, by a vote of 7 to 4, reached a different conclusion. 324 F. 3d 635 (2003). It held the Tribal Court, in prosecuting Lara, was exercising a *federal* prosecutorial power; hence the "dual sovereignty" doctrine does not apply; and the Double Jeopardy Clause bars the second prosecution. *Id.,* at 640. The four dissenting judges, agreeing with the Federal Government, concluded that the Tribal Court had exercised *inherent tribal* power in prosecuting Lara; hence the "dual sovereignty" doctrine applies and allows the second, federal, prosecution. *Id.,* at 641 (opinion of M. Arnold, J.).

Because the Eighth Circuit and Ninth Circuit have reached different conclusions about the new statute, we

granted certiorari. Cf. *United States* v. *Enas*, 255 F. 3d 662 (CA9 2001) (en banc), cert. denied, 534 U. S. 1115 (2002). We now reverse the Eighth Circuit.

## II

We assume, as do the parties, that Lara's double jeopardy claim turns on the answer to the "dual sovereignty" question. What is "the source of [the] power to punish" nonmember Indian offenders, "inherent *tribal* sovereignty" or delegated *federal* authority? *Wheeler, supra,* at 322 (emphasis added).

We also believe that Congress intended the former answer. The statute says that it "recognize[s] and affirm[s]" in each tribe the *"inherent" tribal* power (not delegated federal power) to prosecute nonmember Indians for misdemeanors. See *supra,* at 198; Appendix, *infra* (emphasis added). And the statute's legislative history confirms that such was Congress' intent. See, *e. g.,* H. R. Conf. Rep. No. 102–261, pp. 3–4 (1991) ("The Committee of the Conference notes that . . . this legislation is not a delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations"); accord, H. R. Rep. No. 102–61, p. 7 (1991); see also S. Rep. No. 102–168, p. 4 (1991) ("recogniz[ing] and reaffirm[ing] the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians"); 137 Cong. Rec. 9446 (1991) (remarks of Sen. Inouye) (the "premise [of the legislation] is that the Congress affirms the *inherent* jurisdiction of tribal governments over nonmember Indians" (emphasis added)); *id.,* at 10712–10714 (remarks of Rep. Miller, House manager of the bill) (the statute "is not a delegation of authority but an affirmation that tribes retain all rights not expressly taken away" and the bill "recognizes an inherent tribal right which always existed"); *id.,* at 10713 (remarks of Rep. Richardson, a sponsor of the amendment) (the legislation "reaffirms" tribes' power).

Thus the statute seeks to adjust the tribes' status. It relaxes the restrictions, recognized in *Duro*, that the political branches had imposed on the tribes' exercise of inherent prosecutorial power. The question before us is whether the Constitution authorizes Congress to do so. Several considerations lead us to the conclusion that Congress does possess the constitutional power to lift the restrictions on the tribes' criminal jurisdiction over nonmember Indians as the statute seeks to do.

First, the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as "plenary and exclusive." *E. g., Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 470–471 (1979); *Negonsott* v. *Samuels*, 507 U. S. 99, 103 (1993); see *Wheeler*, 435 U. S., at 323; see also W. Canby, American Indian Law 2 (3d ed. 1998) (hereinafter Canby) ("[T]he independence of the tribes is subject to exceptionally great powers of Congress to regulate and modify the status of the tribes").

This Court has traditionally identified the Indian Commerce Clause, U. S. Const., Art. I, §8, cl. 3, and the Treaty Clause, Art. II, §2, cl. 2, as sources of that power. *E. g., Morton* v. *Mancari*, 417 U. S. 535, 552 (1974); *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 172, n. 7 (1973); see also Canby 11–12; F. Cohen, Handbook of Federal Indian Law 209–210 (1982 ed.) (hereinafter Cohen) (also mentioning, *inter alia*, the Property Clause). The "central function of the Indian Commerce Clause," we have said, "is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192 (1989); see also, *e. g., Ramah Navajo School Bd., Inc.* v. *Bureau of Revenue of N. M.*, 458 U. S. 832, 837 (1982) ("broad power" under the Indian Commerce Clause); *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142 (1980) (same, and citing *Wheeler, supra*, at 322–323).

The treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, "to make Treaties." U. S. Const., Art. II, § 2, cl. 2. But, as Justice Holmes pointed out, treaties made pursuant to that power can authorize Congress to deal with "matters" with which otherwise "Congress could not deal." *Missouri* v. *Holland*, 252 U. S. 416, 433 (1920); see also L. Henkin, Foreign Affairs and the U. S. Constitution 72 (2d ed. 1996). And for much of the Nation's history, treaties, and legislation made pursuant to those treaties, governed relations between the Federal Government and the Indian tribes. See, *e. g.*, Cohen 109–111; F. Prucha, American Indian Policy in the Formative Years 44–49 (1962).

We recognize that in 1871 Congress ended the practice of entering into treaties with the Indian tribes. 25 U. S. C. § 71 (stating that tribes are not entities "with whom the United States may contract by treaty"). But the statute saved existing treaties from being "invalidated or impaired," *ibid.*, and this Court has explicitly stated that the statute "in no way affected Congress' plenary powers to legislate on problems of Indians," *Antoine* v. *Washington*, 420 U. S. 194, 203 (1975) (emphasis deleted).

Moreover, "at least during the first century of America's national existence . . . Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law." Cohen 208 (footnotes omitted). Insofar as that is so, Congress' legislative authority would rest in part, not upon "affirmative grants of the Constitution," but upon the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as "necessary concomitants of nationality." *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 315–322 (1936); Henkin, *supra*, at 14–22, 63–72; cf. 2 J. Continental Cong. 174–175 (1775) (W. Ford ed. 1905) (creating departments of Indian affairs, appointing Indian commissioners, and noting the great importance of "se-

curing and preserving the friendship of the Indian Nations");
*Worcester* v. *Georgia,* 6 Pet. 515, 557 (1832) ("The treaties
and laws of the United States contemplate . . . that all inter-
course with [Indians] shall be carried on exclusively by the
government of the union").

Second, Congress, with this Court's approval, has inter-
preted the Constitution's "plenary" grants of power as au-
thorizing it to enact legislation that both restricts and, in
turn, relaxes those restrictions on tribal sovereign authority.
From the Nation's beginning Congress' need for such legisla-
tive power would have seemed obvious. After all, the Gov-
ernment's Indian policies, applicable to numerous tribes with
diverse cultures, affecting billions of acres of land, of neces-
sity would fluctuate dramatically as the needs of the Nation
and those of the tribes changed over time. See, *e. g.,* Cohen
48. And Congress has in fact authorized at different times
very different Indian policies (some with beneficial results
but many with tragic consequences). Congressional policy,
for example, initially favored "Indian removal," then "assimi-
lation" and the breakup of tribal lands, then protection of the
tribal land base (interrupted by a movement toward greater
state involvement and "termination" of recognized tribes);
and it now seeks greater tribal autonomy within the frame-
work of a "government-to-government relationship" with
federal agencies. 59 Fed. Reg. 22951 (1994); see also 19
Weekly Comp. of Pres. Doc. 98 (1983) (President Reagan re-
affirming the rejection of termination as a policy and an-
nouncing the goal of decreasing tribal dependence on the
Federal Government); see 25 U. S. C. § 450a(b) (congressional
commitment to "the development of strong and stable tribal
governments"). See generally Cohen 78–202 (describing
this history); Canby 13–32 (same).

Such major policy changes inevitably involve major
changes in the metes and bounds of tribal sovereignty. The
1871 statute, for example, changed the status of an Indian
tribe from a "powe[r] . . . capable of making treaties" to a

"power with whom the United States may [not] contract by treaty." Compare *Worcester, supra,* at 559, with 25 U. S. C. § 71.

One can readily find examples in congressional decisions to recognize, or to terminate, the existence of individual tribes. See *United States* v. *Holliday,* 3 Wall. 407, 419 (1866) ("If by [the political branches] those Indians are recognized as a tribe, this court must do the same"); *Menominee Tribe* v. *United States,* 391 U. S. 404 (1968) (examining the rights of Menominee Indians following the termination of their Tribe). Indeed, Congress has restored previously extinguished tribal status—by re-recognizing a Tribe whose tribal existence it previously had terminated. 25 U. S. C. §§ 903–903f (restoring the Menominee Tribe); cf. *United States* v. *Long,* 324 F. 3d 475 (CA7) (upholding against double jeopardy challenge successive prosecutions by the restored Menominee Tribe and the Federal Government), cert. denied, 540 U. S. 822 (2003). Congress has advanced policies of integration by conferring United States citizenship upon all Indians. 8 U. S. C. § 1401(b). Congress has also granted tribes greater autonomy in their inherent law enforcement authority (in respect to tribal members) by increasing the maximum criminal penalties tribal courts may impose. § 4217, 100 Stat. 3207–146, codified at 25 U. S. C. § 1302(7) (raising the maximum from "a term of six months and a fine of $500" to "a term of one year and a fine of $5,000").

Third, Congress' statutory goal—to modify the degree of autonomy enjoyed by a dependent sovereign that is not a State—is not an unusual legislative objective. The political branches, drawing upon analogous constitutional authority, have made adjustments to the autonomous status of other such dependent entities—sometimes making far more radical adjustments than those at issue here. See, *e. g.,* Hawaii—*Hawaii* v. *Mankichi,* 190 U. S. 197, 209–211 (1903) (describing annexation of Hawaii by joint resolution of Congress and the maintenance of a "Republic of Hawaii" until formal incorpo-

ration by Congress); Northern Mariana Islands—note following 48 U. S. C. § 1801 ("in accordance with the [United Nations] trusteeship agreement . . . [establishing] a self-governing commonwealth . . . in political union with and under the sovereignty of the United States"); the Philippines—22 U. S. C. § 1394 (congressional authorization for the President to "withdraw and surrender all right of . . . sovereignty" and to "recognize the independence of the Philippine Islands as a separate and self-governing nation"); Presidential Proclamation No. 2695, 60 Stat. 1352 (so proclaiming); Puerto Rico—Act of July 3, 1950, 64 Stat. 319 ("[T]his Act is now adopted in the nature of a compact so that people of Puerto Rico may organize a government pursuant to a constitution of their own adoption"); P. R. Const., Art. I, § 1 ("Estado Libre Asociado de Puerto Rico"); see also *Cordova & Simonpietri Ins. Agency Inc.* v. *Chase Manhattan Bank N. A.*, 649 F. 2d 36, 39–41 (CA1 1981) (describing various adjustments to Puerto Rican autonomy through congressional legislation since 1898).

Fourth, Lara points to no explicit language in the Constitution suggesting a limitation on Congress' institutional authority to relax restrictions on tribal sovereignty previously imposed by the political branches. But cf. Part III, *infra.*

Fifth, the change at issue here is a limited one. It concerns a power similar in some respects to the power to prosecute a tribe's own members—a power that this Court has called "inherent." *Wheeler*, 435 U. S., at 322–323. In large part it concerns a tribe's authority to control events that occur upon the tribe's own land. See *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and *their territory*" (emphasis added)); see also, *e. g.*, S. Rep. No. 102–168, at 21 (remarks of P. Hugen). And the tribes' possession of this additional criminal jurisdiction is consistent with our traditional understanding of the tribes' status as "domestic dependent nations." *Chero-*

*kee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831); see also *id.*, at 16 (describing tribe as "a distinct political society, separated from others, capable of managing its own affairs and governing itself"). Consequently, we are not now faced with a question dealing with potential constitutional limits on congressional efforts to legislate far more radical changes in tribal status. In particular, this case involves no interference with the power or authority of any State. Nor do we now consider the question whether the Constitution's Due Process or Equal Protection Clauses prohibit tribes from prosecuting a nonmember citizen of the United States. See Part III, *infra.*

Sixth, our conclusion that Congress has the power to relax the restrictions imposed by the political branches on the tribes' inherent prosecutorial authority is consistent with our earlier cases. True, the Court held in those cases that the power to prosecute nonmembers was an aspect of the tribes' external relations and hence part of the tribal sovereignty that was divested by treaties and by Congress. *Wheeler, supra,* at 326; *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191, 209–210 (1978); *Duro*, 495 U. S., at 686. But these holdings reflect the Court's view of the tribes' retained sovereign status *as of the time* the Court made them. They did not set forth constitutional limits that prohibit Congress from changing the relevant legal circumstances, *i. e.,* from taking actions that modify or adjust the tribes' status.

To the contrary, *Oliphant* and *Duro* make clear that the Constitution does not dictate the metes and bounds of tribal autonomy, nor do they suggest that the Court should second-guess the political branches' own determinations. In *Oliphant,* the Court rested its conclusion about inherent tribal authority to prosecute tribe members in large part upon "the commonly shared presumption of Congress, the Executive Branch, and lower federal courts," a presumption which, "[w]hile not conclusive[,] carries considerable weight." 435 U. S., at 206. The Court pointed out that

" 'Indian law' draws principally upon the treaties drawn and executed by the Executive Branch and *legislation passed by Congress." Ibid.* (emphasis added). It added that those "instruments . . . form the backdrop for the intricate web of *judicially made* Indian law." *Ibid.* (emphasis added).

Similarly, in *Duro,* the Court drew upon a host of different sources in order to reach its conclusion that a tribe does not possess the inherent power to prosecute a nonmember. The Court referred to historic practices, the views of experts, the experience of forerunners of modern tribal courts, and the published opinions of the Solicitor of the Department of the Interior. 495 U. S., at 689–692. See also, *e. g., Nevada* v. *Hicks,* 533 U. S. 353, 361, n. 4 (2001) ("Our holding in *Worcester* must be considered in light of . . . the 1828 treaty" (alterations and internal quotation marks omitted)); *South Dakota* v. *Bourland,* 508 U. S. 679, 695 (1993) ("Having concluded that Congress clearly abrogated the Tribe's pre-existing regulatory control over non-Indian hunting and fishing, we find no evidence *in the relevant treaties or statutes* that Congress intended to allow the Tribes to assert regulatory jurisdiction over these lands pursuant to *inherent sovereignty*" (emphasis added)); *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845, 855–856 (1985) ("[T]he existence and extent of a tribal court's jurisdiction will require *[inter alia]* a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions"); *United States* v. *Kagama,* 118 U. S. 375, 382–383 (1886) (characterizing *Ex parte Crow Dog,* 109 U. S. 556, 570 (1883), as resting on extant treaties and statutes and recognizing congressional overruling of *Crow Dog*).

Thus, the Court in these cases based its descriptions of inherent tribal authority upon the sources as they existed at the time the Court issued its decisions. Congressional legislation constituted one such important source. And that source was subject to change. Indeed *Duro* itself antici-

pated change by inviting interested parties to "address the problem [to] Congress." 495 U. S., at 698.

We concede that *Duro*, like several other cases, referred only to the need to obtain a congressional statute that *"delegated"* power to the tribes. See *id.*, at 686 (emphasis added); *Bourland, supra,* at 695, n. 15; *Montana* v. *United States,* 450 U. S. 544, 564 (1981); *Mazurie,* 419 U. S., at 556–557. But in so stating, *Duro* (like the other cases) simply did not consider whether a statute, like the present one, could constitutionally achieve the same end by removing restrictions on the tribes' inherent authority. Consequently we do not read any of these cases as holding that the Constitution forbids Congress to change "judicially made" federal Indian law through this kind of legislation. *Oliphant, supra,* at 206; cf. *County of Oneida* v. *Oneida Indian Nation of N. Y.,* 470 U. S. 226, 233–237 (1985) (recognizing the "federal common law" component of Indian rights, which "common law" federal courts develop as "a 'necessary expedient' when Congress has not 'spoken to a *particular* issue'" (quoting *Milwaukee* v. *Illinois,* 451 U. S. 304, 313–315 (1981))); *id.,* at 313 ("[F]ederal common law is 'subject to the paramount authority of Congress'" (quoting *New Jersey* v. *New York,* 283 U. S. 336, 348 (1931))).

*Wheeler, Oliphant,* and *Duro,* then, are not determinative because Congress has enacted a new statute, relaxing restrictions on the bounds of the inherent tribal authority that the United States recognizes. And that fact makes all the difference.

### III

Lara makes several additional arguments. First, he points out that the Indian Civil Rights Act of 1968, 82 Stat. 77, lacks certain constitutional protections for criminal defendants, in particular the right of an indigent defendant to counsel. See 25 U. S. C. § 1302. And he argues that the Due Process Clause forbids Congress to permit a tribe to prosecute a nonmember Indian citizen of the United States

in a forum that lacks this protection. See *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972) (Constitution guarantees indigents counsel where imprisonment possible).

Lara's due process argument, however, suffers from a critical structural defect. To explain the defect, we contrast this argument with Lara's "lack of constitutional power" argument discussed in Part II, *supra.* Insofar as that "constitutional power" argument might help Lara win his double jeopardy claim, it must proceed in four steps:

*Step One:* Congress does not possess the constitutional power to enact a statute that modifies tribal power by "recogniz[ing] and affirm[ing]" the tribes' "inherent" authority to prosecute nonmember Indians. 25 U. S. C. § 1301(2).

*Step Two:* Consequently, the word "inherent" in the statute's phrase "inherent power" is void.

*Step Three:* The word "inherent" is severable from the rest of the statute (as are related words). The remainder of the statute is valid without those words, but it then delegates *federal* power to the tribe to conduct the prosecution.

*Step Four:* Consequently, the Tribe's prosecution of Lara was federal. The current, second, prosecution is also federal. Hence Lara wins his Double Jeopardy Clause claim, the subject of the present proceeding.

Although the Eighth Circuit accepted this argument, 324 F. 3d, at 640, we reject Step One of the argument, Part II, *supra.* That rejection, without more, invalidates the argument.

Lara's due process argument, however, is significantly different. That argument (if valid) would show that *any* prosecution of a nonmember Indian under the statute is invalid; so Lara's tribal prosecution would be invalid, too. Showing Lara's tribal prosecution was invalid, however, does not show that the *source* of that tribal prosecution was *federal power* (showing that a state prosecution violated the Due Process Clause does not make that prosecution *federal*).

But without that "federal power" showing, Lara cannot win his double jeopardy claim here. Hence, we need not, and we shall not, consider the merits of Lara's due process claim. Other defendants in tribal proceedings remain free to raise that claim should they wish to do so. See 25 U. S. C. § 1303 (vesting district courts with jurisdiction over habeas writs from tribal courts).

Second, Lara argues that Congress' use of the words "all Indians," in the statutory phrase "inherent power . . . to exercise criminal jurisdiction over all Indians," violates the Equal Protection Clause. He says that insofar as the words include nonmember Indians within the statute's scope (while excluding all non-Indians) the statute is race based and without justification. Like the due process argument, however, this equal protection argument is simply beside the point, therefore we do not address it. At best for Lara, the argument (if valid) would show, not that Lara's first conviction was federal, but that it was constitutionally defective. And that showing cannot help Lara win his double jeopardy claim.

Third, Lara points out that the *Duro* Court found the absence of certain constitutional safeguards, for example, the guarantee of an indigent's right to counsel, as an important reason for concluding that tribes lacked the "inherent power" to try a "group of citizens" (namely, nonmember Indians) who were not "include[d]" in those "political bodies." 495 U. S., at 693–694. In fact, *Duro* says the following: "We hesitate to adopt a view of tribal sovereignty that would single out another group of citizens, nonmember Indians, for trial by political bodies that do not include them." *Id.*, at 693. But this argument simply repeats the due process and equal protection arguments rejected above in a somewhat different form. Since precisely the same problem would exist were we to treat the congressional statute as delegating *federal* power, this argument helps Lara no more than the others.

## IV

For these reasons, we hold, with the reservations set forth in Part III, *supra*, that the Constitution authorizes Congress to permit tribes, as an exercise of their inherent tribal authority, to prosecute nonmember Indians. We hold that Congress exercised that authority in writing this statute. That being so, the Spirit Lake Tribe's prosecution of Lara did not amount to an exercise of federal power, and the Tribe acted in its capacity of a separate sovereign. Consequently, the Double Jeopardy Clause does not prohibit the Federal Government from proceeding with the present prosecution for a discrete *federal* offense. *Heath*, 474 U. S., at 88.

The contrary judgment of the Eighth Circuit is

*Reversed.*

### APPENDIX TO OPINION OF THE COURT

Title 25 U. S. C. § 1301(2), as amended by Act of Oct. 28, 1991, 105 Stat. 646, provides:

" '[P]owers of self-government' means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians."

JUSTICE STEVENS, concurring.

While I join the Court's opinion without reservation, the additional writing by my colleagues prompts this comment. The inherent sovereignty of the Indian tribes has a historical basis that merits special mention. They governed territory on this continent long before Columbus arrived. In contrast, most of the States were never actually independent sovereigns, and those that were enjoyed that independent

status for only a few years. Given the fact that Congress can authorize the States to exercise—as *their own*—inherent powers that the Constitution has otherwise placed off limits, see, *e. g., Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 437–438 (1946), I find nothing exceptional in the conclusion that it can also relax restrictions on an ancient inherent tribal power.

JUSTICE KENNEDY, concurring in the judgment.

The amendment to the Indian Civil Rights Act of 1968 (ICRA) enacted after the Court's decision in *Duro* v. *Reina,* 495 U. S. 676 (1990), demonstrates Congress' clear intention to restore to the tribes an inherent sovereign power to prosecute nonmember Indians. Congress was careful to rely on the theory of inherent sovereignty, and not on a delegation. JUSTICE SOUTER's position that it was a delegation nonetheless, *post,* at 231 (dissenting opinion), is by no means without support, but I would take Congress at its word. Under that view, the first prosecution of Lara was not a delegated federal prosecution, and his double jeopardy argument must fail. That is all we need say to resolve this case.

The Court's analysis goes beyond this narrower rationale and culminates in a surprising holding: "For these reasons, we hold . . . that the Constitution authorizes Congress to permit tribes, as an exercise of their inherent tribal authority, to prosecute nonmember Indians." *Ante,* at 210. The Court's holding is on a point of major significance to our understanding and interpretation of the Constitution; and, in my respectful view, it is most doubtful.

Were we called upon to decide whether Congress has this power, it would be a difficult question. Our decision in *United States* v. *Wheeler,* 435 U. S. 313 (1978), which the Court cites today but discusses very little, is replete with references to the inherent authority of the tribe over its own members. As I read that case, it is the historic possession of inherent power over "the relations among members of a

tribe" that is the whole justification for the limited tribal sovereignty the Court there recognized. *Id.*, at 326. It is a most troubling proposition to say that Congress can relax the restrictions on inherent tribal sovereignty in a way that extends that sovereignty beyond those historical limits. Cf., *e. g., Strate* v. *A–1 Contractors*, 520 U. S. 438, 445–446 (1997) ("In the main . . . 'the inherent sovereign powers of an Indian tribe'—those powers a tribe enjoys apart from express provision by treaty or statute—'do not extend to the activities of nonmembers of the tribe'" (quoting *Montana* v. *United States*, 450 U. S. 544, 565 (1981))). To conclude that a tribe's inherent sovereignty allows it to exercise jurisdiction over a nonmember in a criminal case is to enlarge the "unique and limited character" of the inherent sovereignty that *Wheeler* recognized. 435 U. S., at 323.

Lara, after all, is a citizen of the United States. To hold that Congress can subject him, within our domestic borders, to a sovereignty outside the basic structure of the Constitution is a serious step. The Constitution is based on a theory of original, and continuing, consent of the governed. Their consent depends on the understanding that the Constitution has established the federal structure, which grants the citizen the protection of two governments, the Nation and the State. Each sovereign must respect the proper sphere of the other, for the citizen has rights and duties as to both. See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 838–839 (1995) (KENNEDY, J., concurring). Here, contrary to this design, the National Government seeks to subject a citizen to the criminal jurisdiction of a third entity to be tried for conduct occurring wholly within the territorial borders of the Nation and one of the States. This is unprecedented. There is a historical exception for Indian tribes, but only to the limited extent that a member of a tribe consents to be subjected to the jurisdiction of his own tribe. See *Duro, supra,* at 693. The majority today reaches beyond that limited exception.

The Court resolves, or perhaps avoids, the basic question of the power of the Government to yield authority inside the domestic borders over citizens to a third sovereign by using the euphemistic formulation that in amending the ICRA Congress merely relaxed restrictions on the tribes. See *ante,* at 196, 200, 202, 205, and 207. There is no language in the statute, or the legislative history, that justifies this unusual phrase, cf. 25 U. S. C. § 1301(2) (referring to "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians"); and, in my respectful view, it obscures what is actually at stake in this case. The terms of the statute are best understood as a grant or cession from Congress to the tribes, and it should not be doubted that what Congress has attempted to do is subject American citizens to the authority of an extraconstitutional sovereign to which they had not previously been subject. The relaxing-restrictions formulation is further belied by the involvement of the United States in all aspects of the tribal prosecution of a nonmember Indian. Federal law defines the separate tribes, § 1301, the broader class of "Indians," the maximum penalty which the tribes may impose for crimes, and the procedural protections to which defendants are entitled in the trials, § 1302. This does not indicate the sort of detachment from the exercise of prosecutorial authority implicit in the description of Congress' Act as having relaxed restrictions.

In addition to trying to evade the important structural question by relying on the verbal formula of relaxation, the Court also tries to bolster its position by noting that due process and equal protection claims are still reserved. *Ante,* at 210. That is true, but it ignores the elementary principle that the constitutional structure was in place before the Fifth and Fourteenth Amendments were adopted. To demean the constitutional structure and the consent upon which it rests by implying they are wholly dependent for their vindication on the Due Process and Equal Protection

Clauses is a further, unreasoned holding of serious import. The political freedom guaranteed to citizens by the federal structure is a liberty both distinct from and every bit as important as those freedoms guaranteed by the Bill of Rights. Cf. *Clinton* v. *City of New York*, 524 U. S. 417, 449–453 (1998) (KENNEDY, J., concurring). The individual citizen has an enforceable right to those structural guarantees of liberty, a right which the majority ignores. Perhaps the Court's holding could be justified by an argument that by enrolling in one tribe Lara consented to the criminal jurisdiction of other tribes, but the Court does not mention the point. And, in all events, we should be cautious about adopting that fiction.

The present case, however, does not require us to address these difficult questions of constitutional dimension. Congress made it clear that its intent was to recognize and affirm tribal authority to try Indian nonmembers as inherent in tribal status. The proper occasion to test the legitimacy of the Tribe's authority, that is, whether Congress had the power to do what it sought to do, was in the first, tribal proceeding. There, however, Lara made no objection to the Tribe's authority to try him. In the second, federal proceeding, because the express rationale for the Tribe's authority to try Lara—whether legitimate or not—was inherent sovereignty, not delegated federal power, there can be no double jeopardy violation. Cf. *Grafton* v. *United States*, 206 U. S. 333, 345 (1907) ("[B]efore a person can be said to have been put in jeopardy of life or limb the court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged"). For that reason, I concur in the judgment.

JUSTICE THOMAS, concurring in the judgment.

As this case should make clear, the time has come to reexamine the premises and logic of our tribal sovereignty cases. It seems to me that much of the confusion reflected

in our precedent arises from two largely incompatible and doubtful assumptions. First, Congress (rather than some other part of the Federal Government) can regulate virtually every aspect of the tribes without rendering tribal sovereignty a nullity. See, *e. g., United States* v. *Wheeler,* 435 U. S. 313, 319 (1978). Second, the Indian tribes retain inherent sovereignty to enforce their criminal laws against their own members. See, *e. g., id.,* at 326. These assumptions, which I must accept as the case comes to us, dictate the outcome in this case, and I therefore concur in the judgment.

I write separately principally because the Court fails to confront these tensions, a result that flows from the Court's inadequate constitutional analysis. I cannot agree with the Court, for instance, that the Constitution grants to Congress plenary power to calibrate the "metes and bounds of tribal sovereignty." *Ante,* at 202; see also *ante,* at 210 (holding that "the Constitution authorizes Congress" to regulate tribal sovereignty). Unlike the Court, *ante,* at 200–201, I cannot locate such congressional authority in the Treaty Clause, U. S. Const., Art. II, § 2, cl. 2, or the Indian Commerce Clause, Art. I, § 8, cl. 3. Additionally, I would ascribe much more significance to legislation such as the Act of Mar. 3, 1871, Rev. Stat. § 2079, 16 Stat. 566, codified at 25 U. S. C. § 71, that purports to terminate the practice of dealing with Indian tribes by treaty. The making of treaties, after all, is the one mechanism that the Constitution clearly provides for the Federal Government to interact with sovereigns other than the States. Yet, if I accept that Congress does have this authority, I believe that the result in *Wheeler* is questionable. In my view, the tribes either are or are not separate sovereigns, and our federal Indian law cases untenably hold both positions simultaneously.

I

In response to the Court's decision in *Duro* v. *Reina,* 495 U. S. 676 (1990) (holding that the tribes lack inherent author-

ity to prosecute nonmember Indians), Congress amended the Indian Civil Rights Act of 1968 (ICRA). Specifically, through this *"Duro* fix," Congress amended ICRA's definition of the tribes' "powers of self-government" to "recogniz[e] and affir[m]" the existence of "inherent power . . . to exercise criminal jurisdiction over all Indians." 25 U. S. C. § 1301(2). There is quite simply no way to interpret a recognition and affirmation of inherent power as a delegation of federal power, as the Court explains. *Ante,* at 199. Delegated power is the very antithesis of inherent power.

But even if the statute were less clear, I would not interpret it as a delegation of federal power. The power to bring federal prosecutions, which is part of the putative delegated power, is manifestly and quintessentially executive power. *Morrison* v. *Olson,* 487 U. S. 654, 691 (1988); *id.,* at 705 (SCALIA, J., dissenting). Congress cannot transfer federal executive power to individuals who are beyond "meaningful Presidential control." *Printz* v. *United States,* 521 U. S. 898, 922–923 (1997). And this means that, at a minimum, the President must have some measure of "the power to appoint and remove" those exercising that power. *Id.,* at 922; see also *Morrison, supra,* at 706–715 (SCALIA, J., dissenting).

It does not appear that the President has any control over tribal officials, let alone a substantial measure of the appointment and removal power. Cf. Brief for National Congress of American Indians as *Amicus Curiae* 27–29. Thus, at least until we are prepared to recognize absolutely independent agencies entirely outside of the Executive Branch with the power to bind the Executive Branch (for a tribal prosecution would then bar a subsequent federal prosecution), the tribes cannot be analogized to administrative agencies, as the dissent suggests, *post,* at 227 (opinion of SOUTER, J.). That is, reading the *"Duro* fix" as a delegation of federal power (without also divining some adequate method of Presidential control) would create grave constitutional difficulties. Cf. *INS* v. *St. Cyr,* 533 U. S. 289, 299–300 (2001); *Solid Waste*

*Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159, 173 (2001). Accordingly, the Court has only two options: Either the *"Duro* fix" changed the result in *Duro* or it did nothing at all.[1]

## II

In *Wheeler,* 435 U. S., at 322–323, the Court explained that, prior to colonization, "the tribes were self-governing sovereign political communities." The Court acknowledged, however, that, after "[t]heir incorporation within the territory of the United States," the tribes could exercise their inherent sovereignty only as consistent with federal policy embodied in treaties, statutes, and Executive Orders. *Id.,* at 323; see also *id.,* at 327–328. Examining these sources for potential conflict, the Court concluded that the tribes retained the ability to exercise their inherent sovereignty to punish their own members. *Id.,* at 323–330.

Although *Wheeler* seems to be a sensible example of federal common lawmaking, I am not convinced that it was correctly decided. To be sure, it makes sense to conceptualize

---

[1] I am sympathetic to JUSTICE KENNEDY's position that we need not resolve the question presented. *Ante,* at 211 (opinion concurring in judgment). If Congress has power to restore tribal authority to prosecute nonmember Indians, respondent's tribal prosecution was the legitimate exercise of a separate sovereign. As such, under the dual sovereignty doctrine, it does not bar his subsequent federal prosecution. On the other hand, if the amendment to ICRA had no effect (the only other possibility), jeopardy did not attach in the tribal prosecution. See, *e. g., Serfass* v. *United States,* 420 U. S. 377, 391 (1975); *Grafton* v. *United States,* 206 U. S. 333, 345 (1907) (noting "that before a person can be said to have been put in jeopardy of life or limb the court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged"); *United States* v. *Phelps,* 168 F. 3d 1048, 1053–1054 (CA8 1999) (holding tribal court prosecution without jurisdiction did not bar subsequent federal prosecution). Jeopardy could have attached in the tribal prosecution for federal purposes only if the Federal Government had authorized the prosecution. But Congress did not authorize tribal prosecutions, and nothing suggests that the Executive Branch prompted respondent's tribal prosecution.

the tribes as sovereigns that, due to their unique situation, cannot exercise the full measure of their sovereign powers. *Wheeler*, at times, seems to analyze the problem in just this way. See, *e. g., id.*, at 323–326; *id.*, at 323 (relying on *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978), discussed *infra*).

But I do not see how this is consistent with the apparently "undisputed fact that Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government." 435 U. S., at 319. The sovereign is, by definition, the entity "in which independent and supreme authority is vested." Black's Law Dictionary 1395 (6th ed. 1990). It is quite arguably the essence of sovereignty not to exist merely at the whim of an external government.

Further, federal policy itself could be thought to be inconsistent with this residual-sovereignty theory. In 1871, Congress enacted a statute that purported to prohibit entering into treaties with the "Indian nation[s] or tribe[s]." 16 Stat. 566, codified at 25 U. S. C. § 71. Although this Act is constitutionally suspect (the Constitution vests in the President both the power to make treaties, Art. II, § 2, cl. 2, and to recognize foreign governments, Art. II, § 3; see, *e. g., United States* v. *Pink*, 315 U. S. 203, 228–230 (1942)), it nevertheless reflects the view of the political branches that the tribes had become a purely domestic matter.

To be sure, this does not quite suffice to demonstrate that the tribes had lost their sovereignty. After all, States retain sovereignty despite the fact that Congress can regulate States *qua* States in certain limited circumstances. See, *e. g., Katzenbach* v. *Morgan*, 384 U. S. 641 (1966); cf. *New York* v. *United States*, 505 U. S. 144, 160–161 (1992); *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985). But the States (unlike the tribes) are part of a constitutional framework that allocates sovereignty between the State and Federal Governments and specifically grants Congress authority to legislate with respect to them, see

U. S. Const., Amdt. 14, § 5. And even so, we have explained that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U. S., at 166; *id.*, at 162–166; see also *Printz*, 521 U. S., at 910–915.

The tribes, by contrast, are not part of this constitutional order, and their sovereignty is not guaranteed by it. As Chief Justice Marshall explained:

> "[T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else. . . .
>
> "[Y]et it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations." *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 16–17 (1831).

Chief Justice Marshall further described the tribes as "independent political communities, retaining their original natural rights," and specifically noted that the tribes possessed the power to "mak[e] treaties." *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832). Although the tribes never fit comfortably within the category of foreign nations, the 1871 Act tends to show that the political branches no longer considered the tribes to be anything like foreign nations. And it is at least arguable that the United States no longer considered the tribes to be sovereigns.[2] Federal Indian policy is, to say the least, schizophrenic. And this confusion continues to infuse federal Indian law and our cases.

---

[2] Additionally, the very enactment of ICRA through normal legislation conflicts with the notion that tribes possess inherent sovereignty. Title 25 U. S. C. § 1302, for example, requires tribes "in exercising powers of self-government" to accord individuals most of the protections in the Bill of Rights. I doubt whether Congress could, through ordinary legislation, require States (let alone foreign nations) to use grand juries.

Nevertheless, if I accept *Wheeler*, I also must accept that the tribes do retain inherent sovereignty (at least to enforce their criminal laws against their own members) and the logical consequences of this fact. In *Heath* v. *Alabama*, 474 U. S. 82, 88 (1985), the Court elaborated the dual sovereignty doctrine and explained that a single act that violates the " 'peace and dignity' of two sovereigns by breaking the laws of each" constitutes two separate offenses. This, of course, is the reason that the Double Jeopardy Clause does not bar successive prosecutions by separate sovereigns. But whether an act violates the "peace and dignity" of a sovereign depends not in the least on whether the perpetrator is a member (in the case of the tribes) or a citizen (in the case of the States and the Nation) of the sovereign.

*Heath* also instructs, relying on *Wheeler*, that the separate-sovereign inquiry "turns on whether the two entities draw their authority to punish the offender from distinct sources of power." *Heath, supra*, at 88. But *Wheeler* makes clear that the tribes and the Federal Government do draw their authority to punish from distinct sources and that they are separate sovereigns. Otherwise, the subsequent federal prosecution in *Wheeler* would have violated the Double Jeopardy Clause.[3] It follows from our case law that Indian tribes possess inherent sovereignty to punish *anyone* who violates their laws.

In *Duro* v. *Reina*, 495 U. S. 676 (1990), the Court held that the Indian tribes could no longer enforce their criminal laws against nonmember Indians. Despite the obvious tension, *Duro* and *Wheeler* are not necessarily inconsistent. Although *Wheeler* and *Heath*, taken together, necessarily imply that the tribes retain inherent sovereignty to try anyone who violates their criminal laws, *Wheeler* and *Duro* make

---

[3] I acknowledge that *Wheeler* focused specifically on the tribes' authority to try their own members. See 435 U. S., at 323–330. But, as I discuss below, the distinction between the tribes' external and internal powers is not constitutionally required.

clear that conflict with federal policy can operate to prohibit the exercise of this sovereignty. *Duro*, then, is not a case about "inherent sovereignty" (a term that we have used too imprecisely); rather, it is a case about whether a specific exercise of tribal sovereignty conflicts with federal policy.

Indeed, the Court in *Duro* relied primarily on *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978), which held that tribes could not enforce their criminal laws against non-Indians. In reaching that conclusion, the Court in *Oliphant* carefully examined the views of Congress and the Executive Branch. *Id.*, at 197–206 (discussing treaties, statutes, and views of the Executive Branch); *id.*, at 199 (discussing Attorney General opinions, including 2 Op. Atty. Gen. 693 (1834) (concluding that tribal exercise of criminal jurisdiction over non-Indians was inconsistent with various treaties)). *Duro* at least rehearsed the same analysis. 495 U. S., at 688–692. Thus, although *Duro* is sprinkled with references to various constitutional concerns, see, *e. g.*, *id.*, at 693–694, *Duro*, *Oliphant*, and *Wheeler* are classic federal-common-law decisions. See also *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 233–236 (1985).

I acknowledge that our cases have distinguished between "tribal power [that] is necessary to protect tribal self-government or to control internal relations" and tribal power as it relates to the external world. *Montana* v. *United States*, 450 U. S. 544, 564 (1981); see also *Nevada* v. *Hicks*, 533 U. S. 353, 358–359 (2001); *South Dakota* v. *Bourland*, 508 U. S. 679, 695, n. 15 (1993); *Duro, supra*, at 685–686; *Wheeler*, 435 U. S., at 322–325. This distinction makes perfect sense as a matter of federal common law: Purely "internal" matters are by definition unlikely to implicate any federal policy. But, critically, our cases have never drawn this line as a constitutional matter. That is why we have analyzed extant federal law (embodied in treaties, statutes, and Executive Orders) before concluding that particular tribal assertions of power were incompatible with the position of the tribes.

See, *e. g.*, *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 853–854 (1985); *Oliphant, supra*, at 204 ("While Congress never expressly forbade Indian tribes to impose criminal penalties on non-Indians, we now make express our implicit conclusion of nearly a century ago [referring to *In re Mayfield*, 141 U. S. 107 (1891)] that Congress consistently believed this to be the necessary result of its repeated legislative actions").[4]

As noted, in response to *Duro*, Congress amended ICRA. Specifically, Congress "recognized and affirmed" the existence of "inherent power . . . to exercise criminal jurisdiction over all Indians." 25 U. S. C. § 1301(2). President Bush signed this legislation into law. See 27 Weekly Comp. of Pres. Doc. 1573–1574 (1991). Further, as this litigation demonstrates, it is the position of the Executive Branch that the tribes possess inherent authority to prosecute nonmember Indians.

In my view, these authoritative pronouncements of the political branches make clear that the exercise of this aspect of sovereignty is not inconsistent with federal policy and therefore with the position of the tribes. Thus, while *Duro* may have been a correct federal-common-law decision at the time, the political branches have subsequently made clear that the

---

[4] JUSTICE SOUTER believes that I have overlooked *Oliphant*'s reliance on sources other than "treaties, statutes, and the views of the Executive Branch." *Post*, at 230, n. 2. JUSTICE SOUTER quotes the following passage from *Oliphant:* "[E]ven ignoring treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress. . . . Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers *inconsistent with their status*." 435 U. S., at 208 (emphasis added; internal quotation marks and citation omitted). The second quoted sentence is entirely consistent with federal common lawmaking and is difficult to understand as anything else. I admit that the first sentence, which removes from consideration most of the sources of federal common law, makes the second sentence puzzling. But this is precisely the confusion that I have identified and that I hope the Court begins to resolve.

tribes' exercise of criminal jurisdiction against nonmember Indians is consistent with federal policy. The potential conflicts on which *Duro* must have been premised, according to the political branches, do not exist. See also *ante*, at 205. I therefore agree that, as the case comes to us, the Tribe acted as a separate sovereign when it prosecuted respondent. Accordingly, the Double Jeopardy Clause does not bar the subsequent federal prosecution.

## III

I believe that we must examine more critically our tribal sovereignty case law. Both the Court and the dissent, however, compound the confusion by failing to undertake the necessary rigorous constitutional analysis. I would begin by carefully following our assumptions to their logical conclusions and by identifying the potential sources of federal power to modify tribal sovereignty.

The dissent admits that "[t]reaties and statutes delineating the tribal-federal relationship are properly viewed as an independent elaboration by the political branches of the fine details of the tribes' dependent position, which strips the tribes of any power to exercise criminal jurisdiction over those outside their own memberships." *Post*, at 228. To the extent that this is a description of the federal-common-law process, I agree. But I do not understand how the dissent can then conclude that "the jurisdictional implications [arising from this analysis are] constitutional in nature." *Ibid.* By this I understand the dissent to mean that Congress cannot alter the result, though the dissent never quite says so.

The analysis obviously has constitutional implications. It is, for example, dispositive of respondent's double jeopardy claim. But it does not follow that this Court's federal-common-law decisions limiting tribes' authority to exercise their inherent sovereignty somehow become enshrined as constitutional holdings that the political branches cannot

alter. When the political branches demonstrate that a particular exercise of the tribes' sovereign power is in fact consistent with federal policy, the underpinnings of a federal-common-law decision disabling the exercise of that tribal power disappear. Although I do not necessarily agree that the tribes have any residual inherent sovereignty or that Congress is the constitutionally appropriate branch to make adjustments to sovereignty, see Part II, *supra*, it is important to recognize the logical implications of these assumptions.

Similarly unavailing is the dissent's observation that when we perform the separate-sovereign analysis "we are undertaking a constitutional analysis based on legal categories of constitutional dimension." *Post*, at 229. The dissent concludes from this that our double jeopardy analysis in this context "must itself have had constitutional status." *Ibid.* This *ipse dixit* does not transform our common-law decisions into constitutional holdings. Cf. *Dickerson* v. *United States*, 530 U. S. 428, 459–461 (2000) (SCALIA, J., dissenting).

I do, however, agree that this case raises important constitutional questions that the Court does not begin to answer. The Court utterly fails to find any provision of the Constitution that gives Congress enumerated power to alter tribal sovereignty. The Court cites the Indian Commerce Clause and the treaty power. *Ante*, at 200. I cannot agree that the Indian Commerce Clause " 'provide[s] Congress with plenary power to legislate in the field of Indian affairs.' " *Ibid.* (quoting *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192 (1989)). At one time, the implausibility of this assertion at least troubled the Court, see, *e. g., United States* v. *Kagama*, 118 U. S. 375, 378–379 (1886) (considering such a construction of the Indian Commerce Clause to be "very strained"), and I would be willing to revisit the question. Cf., *e. g., United States* v. *Morrison*, 529 U. S. 598 (2000); *United States* v. *Lopez*, 514 U. S. 549 (1995); *id.*, at 584–593 (THOMAS, J., concurring).

Next, the Court acknowledges that "[t]he treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, 'to make Treaties.'" *Ante*, at 201 (quoting U. S. Const., Art. II, §2, cl. 2). This, of course, suffices to show that it provides *no* power to *Congress*, at least in the absence of a specific treaty. Cf. *Missouri* v. *Holland*, 252 U. S. 416 (1920). The treaty power does not, as the Court seems to believe, provide Congress with free-floating power to legislate as it sees fit on topics that could potentially implicate some unspecified treaty. Such an assertion is especially ironic in light of Congress' enacted prohibition on Indian treaties.

In the end, the Court resorts to citing past examples of congressional assertions of this or similar power. *Ante*, at 202–203. At times, such history might suffice. Cf. *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring). But it does not suffice here for at least two reasons. First, federal Indian law is at odds with itself. I find it difficult to reconcile the result in *Wheeler* with Congress' 1871 prospective prohibition on the making of treaties with the Indian tribes. The Federal Government cannot simultaneously claim power to regulate virtually every aspect of the tribes through ordinary domestic legislation and also maintain that the tribes possess anything resembling "sovereignty." See Part II, *supra*. In short, the history points in both directions.

Second, much of the practice that the Court cites does not actually help its argument. The "Insular Cases," which include the Hawaii and Puerto Rico examples, *ante*, at 203–204, involved Territories of the United States, over which Congress has plenary power to govern and regulate. See *Reid* v. *Covert*, 354 U. S. 1, 13 (1957); U. S. Const., Art. IV, §3, cl. 2. The existence of a textual source for congressional power distinguishes these cases. And, incidentally, al-

though one might think that Congress' authority over the tribes could be found in Article IV, § 3, cl. 2, the Court has held that the Territories are the United States for double jeopardy purposes, see, *e. g., Wheeler,* 435 U. S., at 321–322; *Puerto Rico* v. *Shell Co. (P. R.), Ltd.,* 302 U. S. 253, 264–266 (1937), which would preclude the result in *Wheeler.* It is for this reason as well that the degree of autonomy of Puerto Rico is beside the point. See *Wheeler, supra,.* at 321; *post,* at 229.

The Court should admit that it has failed in its quest to find a source of congressional power to adjust tribal sovereignty. Such an acknowledgment might allow the Court to ask the logically antecedent question *whether* Congress (as opposed to the President) has this power. A cogent answer would serve as the foundation for the analysis of the sovereignty issues posed by this case. We might find that the Federal Government cannot regulate the tribes through ordinary domestic legislation and simultaneously maintain that the tribes are sovereigns in any meaningful sense. But until we begin to analyze these questions honestly and rigorously, the confusion that I have identified will continue to haunt our cases.

JUSTICE SOUTER, with whom JUSTICE SCALIA joins, dissenting.

It is as true today as it was in 1886 that the relationship of Indian tribes to the National Government is "an anomalous one and of a complex character." *United States* v. *Kagama,* 118 U. S. 375, 381. Questions of tribal jurisdiction, whether legislative or judicial, do not get much help from the general proposition that tribes are "domestic dependent nations," *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 17 (1831), or "wards of the [American] nation," *Kagama, supra,* at 383. Our cases deciding specific questions, however, demonstrate that the tribes do retain jurisdiction necessary to protect tribal self-government or control internal tribal relations,

*Montana* v. *United States,* 450 U. S. 544, 564 (1981), including the right to prosecute tribal members for crimes, *United States* v. *Wheeler,* 435 U. S. 313, 323–324 (1978), a sovereign right that is "inherent," *ibid.,* but neither exclusive, *Kagama, supra,* at 384–385 (federal criminal jurisdiction), nor immune to abrogation by Congress, *Wheeler, supra,* at 323 ("the sufferance of Congress"). Furthermore, except as provided by Congress, tribes lack criminal jurisdiction over non-Indians, *Oliphant* v. *Suquamish Tribe,* 435 U. S. 191, 212 (1978), and over nonmember Indians, *Duro* v. *Reina,* 495 U. S. 676, 685, 688 (1990).

Of particular relevance today, we held in *Duro* that because tribes have lost their inherent criminal jurisdiction over nonmember Indians, any subsequent exercise of such jurisdiction "could only have come to the Tribe" (if at all) "by delegation from Congress." *Id.,* at 686. Three years later, in *South Dakota* v. *Bourland,* 508 U. S. 679 (1993), we reiterated this understanding that any such "delegation" would not be a restoration of prior inherent sovereignty; we specifically explained that "tribal sovereignty over nonmembers cannot survive without express congressional delegation, and is therefore *not* inherent." *Id.,* at 695, n. 15 (emphasis in original; citation and internal quotation marks omitted).[1] Our precedent, then, is that any tribal exercise of criminal jurisdiction over nonmembers necessarily rests on a "delegation" of federal power and is not akin to a State's congressionally permitted exercise of some authority that would otherwise be barred by the dormant Commerce Clause, see *New York* v. *United States,* 505 U. S. 144, 171 (1992). It is more like the delegation of lawmaking power to an administrative agency, whose jurisdiction would not even exist absent congressional authorization.

---

[1] *Bourland* was a civil case about the regulation of hunting and fishing by non-Indians. Its applicability in the criminal context is presumably *a fortiori.*

228

It is of no moment that we have given ostensibly alternating explanations for this conclusion. We have sometimes indicated that the tribes' lack of inherent criminal jurisdiction over nonmembers is a necessary legal consequence of the basic fact that the tribes are dependent on the Federal Government. *Wheeler, supra,* at 326 ("[The tribes' inability to] try nonmembers in tribal courts . . . rest[s] on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations"); *Oliphant,* 435 U. S., at 210 ("By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States . . ."). At other times, our language has suggested that the jurisdictional limit stems from congressional and treaty limitations on tribal powers. See *id.,* at 204 ("Congress' various actions and inactions in regulating criminal jurisdiction on Indian reservations demonstrated an intent to reserve jurisdiction over non-Indians for the federal courts"); *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845, 853–854 (1985) ("In *Oliphant* we . . . concluded that federal legislation conferring jurisdiction on the federal courts to try non-Indians for offenses committed in Indian Country had implicitly pre-empted tribal jurisdiction"). What has never been explicitly stated, but should come as no surprise, is that these two accounts are not inconsistent. Treaties and statutes delineating the tribal-federal relationship are properly viewed as an independent elaboration by the political branches of the fine details of the tribes' dependent position, which strips the tribes of any power to exercise criminal jurisdiction over those outside their own memberships.

What should also be clear, and what I would hold today, is that our previous understanding of the jurisdictional implications of dependent sovereignty was constitutional in nature, certainly so far as its significance under the Double Jeopardy

Clause is concerned. Our discussions of Indian sovereignty
have naturally focused on the scope of tribes' inherent legis-
lative or judicial jurisdiction. *E. g., Nevada* v. *Hicks,* 533
U. S. 353 (2001) (jurisdiction of tribal courts over civil suit
against state official); *South Dakota* v. *Bourland, supra*
(tribal regulations governing hunting and fishing). And ap-
plication of the double jeopardy doctrine of dual sovereignty,
under which one independent sovereign's exercise of crimi-
nal jurisdiction does not bar another sovereign's subsequent
prosecution of the same defendant, turns on just this ques-
tion of how far a prosecuting entity's inherent jurisdiction
extends. *Grafton* v. *United States,* 206 U. S. 333, 354–355
(1907). When we enquire "whether the two [prosecuting]
entities draw their authority to punish the offender from dis-
tinct sources of power," *Heath* v. *Alabama,* 474 U. S. 82, 88
(1985), in other words, we are undertaking a constitutional
analysis based on legal categories of constitutional dimension
(*i. e.,* is this entity an independent or dependent sovereign?).
Thus, our application of the doctrines of independent and
dependent sovereignty to Indian tribes in response to a dou-
ble jeopardy claim must itself have had constitutional status.
See *Wheeler, supra,* at 326 (holding that tribes' inability to
prosecute nonmembers "rest[s] on the fact that the depend-
ent status of Indian tribes within our territorial jurisdiction
is necessarily inconsistent with their freedom independently
to determine their external relations").

That means that there are only two ways that a tribe's
inherent sovereignty could be restored so as to alter applica-
tion of the dual sovereignty rule: either Congress could grant
the same independence to the tribes that it did to the Philip-
pines, see *ante,* at 204, or this Court could repudiate its exist-
ing doctrine of dependent sovereignty. The first alternative
has obviously not been attempted, and I see no reason for us
to venture down a path toward the second. To begin with,
the theory we followed before today has the virtue of fitting
the facts: no one could possibly deny that the tribes are sub-

ordinate to the National Government. Furthermore, while this is not the place to reexamine the concept of dual sovereignty itself, there is certainly no reason to adopt a canon of broad construction calling for maximum application of the doctrine. Finally, and perhaps most importantly, principles of *stare decisis* are particularly compelling in the law of tribal jurisdiction, an area peculiarly susceptible to confusion. And confusion, I fear, will be the legacy of today's decision, for our failure to stand by what we have previously said reveals that our conceptualizations of sovereignty and dependent sovereignty are largely rhetorical.[2]

---

[2] JUSTICE THOMAS's disagreement with me turns ultimately on his readiness to discard prior case law in this field and, indeed, on his rejection in this very case of the concept of dependent sovereignty. He notes, for example, *ante*, at 220 (opinion concurring in judgment), that the Court in *Heath* v. *Alabama*, 474 U. S. 82, 88 (1985), explained that one act that violates the peace and dignity of two sovereigns constitutes two separate offenses for purposes of double jeopardy. JUSTICE THOMAS then concludes that whether an act violates a sovereign's peace and dignity does not depend (when the sovereign is an Indian tribe) on whether the perpetrator is a member of the tribe. JUSTICE THOMAS therefore assumes that tribes "retain inherent sovereignty to try anyone who violates their criminal laws." *Ante*, at 220. This Court, however, has held exactly to the contrary: a tribe has no inherent jurisdiction to prosecute a nonmember. In rejecting this precedent, JUSTICE THOMAS implicitly rejects the concept of dependent sovereignty, upon which our holdings in *United States* v. *Wheeler*, 435 U. S. 313 (1978), and *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978), rested. Reciting *Oliphant*'s examination of treaties, statutes, and views of the Executive Branch, JUSTICE THOMAS attempts to suggest that these opinions were only momentary expressions of malleable federal policy. But he somehow ignores *Oliphant*'s own emphasis that its analysis did not rest on historical expressions of federal policy; rather, "even ignoring treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress. . . . Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers *inconsistent with their status*." *Id.*, at 208 (emphasis in original; citation and internal quotation marks omitted); see also *Duro* v. *Reina*, 495 U. S. 676, 686 (1990). There is simply no basis for JUSTICE THOMAS's recharacterization of this clear holding.

I would therefore stand by our explanations in *Oliphant* and *Duro* and hold that Congress cannot reinvest tribal courts with inherent criminal jurisdiction over nonmember Indians. It is not that I fail to appreciate Congress's express wish that the jurisdiction conveyed by statute be treated as inherent, but Congress cannot control the interpretation of the statute in a way that is at odds with the constitutional consequences of the tribes' continuing dependent status. What may be given controlling effect, however, is the principal object of the 1990 amendments to the Indian Civil Rights Act of 1968, 25 U. S. C. § 1301 *et seq.*, which was to close "the jurisdictional void" created by *Duro* by recognizing (and empowering) the tribal court as "the best forum to handle misdemeanor cases over non-member Indians," H. R. Rep. No. 102–261, p. 6 (1991). I would therefore honor the drafters' substantive intent by reading the Act as a delegation of federal prosecutorial power that eliminates the jurisdictional gap.[3] Finally, I would hold that a tribe's exercise of this delegated power bars subsequent federal prosecution for the same offense. I respectfully dissent.

---

[3] JUSTICE THOMAS suggests that this delegation may violate the separation of powers. *Ante*, at 215–217. But we are not resolving the question whether Lara could be "prosecuted pursuant to . . . delegated power," 324 F. 3d 635, 640 (CA8 2003), only whether the prosecution was in fact the exercise of an inherent power, see Pet. for Cert. (I), and whether the exercise of a delegated power would implicate the protection against double jeopardy.